RAYMOND C. BATEMAN & others[1] vs. BOARD OF APPEALS OF
GEORGETOWN & others.[2]

No. 01-P-31.

Essex. June 13, 2002. - October 9, 2002.

Present: ARMSTRONG, C.J., GRASSO, & KAFKER, JJ.

*Easement. Real Property,* Easement. *Eminent Domain,* Interest in property
taken. *Zoning,* Variance, Frontage, Special permit, Agriculture. *Stable.*

An easement, which was created to remedy the elimination of access and
    egress to three parcels caused when the Commonwealth took land through
    its eminent domain powers to create a highway, was not overloaded when
    activities on the parcels were extended into after-acquired property not
    explicitly addressed in the easement, where a second easement adjacent to
    the first provided access and egress to the fourth parcel, and the second
    easement was not limited to a particular purpose or scope. [239-240]
A town's zoning board of appeals (board) properly granted a variance from a
    zoning by-law's frontage requirement for a locus whose odd shape resulted
    wholly from the Commonwealth, through its eminent domain powers,
    depriving the locus of any frontage through no fault of the current or
    previous owners, where granting the variance did not harm the public good
    [240-242]; likewise, the board properly granted the owner of the locus a
    special permit to construct more than one building, where the decision was
    not arbitrary, capricious, unreasonable, or based on legally untenable
    grounds [242].
The owner of a particular locus did not need a special permit to use the locus
    as a public stable and riding academy, because such a use fell within the
    agricultural use exemption of G. L. c. 40, § 3. [242-243]

CIVIL ACTION commenced in the Superior Court Department on
April 17, 1998.

The case was heard by *Barbara J. Rouse,* J.

*George E. Richardson* for the plaintiffs.

*Mark B. Johnson* for the defendants.

KAFKER, J. The Board of Appeals of Georgetown (board)

---

[1]Richard W. Bateman and Diane L. Bateman.

[2]Cynthia Wylie and the estate of Arnold Belkin.

granted the defendant Cynthia Wylie a variance and special permit allowing her to construct a riding academy and public stable. Raymond C., Richard W., and Diane L. Bateman, abutters to the land,[3] appealed to the Superior Court under G. L. c. 40A, § 17. A judge of that court decided the board had acted within its authority. On appeal, the Batemans argue as follows: (1) Wylie's proposed use of the land overloads an easement which serves her property; (2) the judge's findings fail to support the grant of a variance from required frontage or the grant of a special permit to construct more than one building; and (3) Wylie requires a special permit because her proposed use does not fall within the agricultural use exemption to the zoning law.[4] We conclude that there was no error and affirm.

1. *Background.* Wylie wishes to construct a riding stable on a thirty-six acre site (locus) situated off Jewett Street and Hazen Court in Georgetown. The locus consists of four contiguous parcels: three lower lots and one larger upper lot. Wylie entered into a contract with the owner of the land, Arnold Belkin, to purchase the locus subject to the necessary approval.[5] Over the Batemans' property abutting the locus runs a forty-foot wide easement from Jewett Street, a public way, to the three lower parcels. The locus is oddly shaped, somewhat resembling a pork chop. The three lower parcels depend on the easement for access to a public way.

The shape of the combined properties and the three lower lots' absence of frontage resulted from a 1951 eminent domain taking by the Commonwealth for Interstate Route 95 (I-95). The Commonwealth took portions of the three lower lots that had direct frontage on Jewett Street. At the same time as this

---

[3]The trial judge correctly concluded that the Batemans had standing to bring this appeal. See G. L. c. 40A, § 17; *Marashlian* v. *Zoning Bd. of Appeals of Newburyport,* 421 Mass. 719, 721 (1996).

[4]The Batemans' last argument, that the board's decision must be annulled because the board took additional evidence from Wylie after the close of the public hearing, is insufficiently developed to satisfy the requirements of Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and is, accordingly, waived.

[5]During the course of the litigation Belkin died, and the land is currently owned by his estate.

taking, the Commonwealth took the forty-foot wide easement in the Batemans' property to enable the then owners of the three lower lots to access Jewett Street, thereby ameliorating damage to the parcels. Specifically, the easement was taken by the Department of Public works "in behalf of owners of land whose rights of access [to Jewett Street] and egress therefrom would otherwise become inoperative due to the limited access provisions of said State highway layout, and consist[s] of the right to enter on said parcels of land at any time to construct, . . . maintain and use, roadways . . . as the various persons in whose behalf said easements are taken may require." The easement over the Bateman's land further stated that said parcel is "hereby taken in behalf of Philip Belkin, Arnold Belkin and Barnet Barnstein." Belkin later acquired full ownership of the three lower parcels and the fourth upper parcel.

The fourth, upper parcel also depends on an easement for access to a public way. This parcel is benefited by a separate twenty-foot wide easement, also over the Batemans' land. That easement was created by an 1870 deed. As the Land Court judge found in related litigation in Belkin *vs*. Bateman, Land Court, Misc. Case No. 176674 (November 27, 1995),[6] the language of the 1870 deed of the right of way expressed a grant in general terms because it did not limit access to a particular use or scope. The Superior Court judge here found that the second easement runs adjacent to the forty-foot wide easement.

Wylie plans to construct an enclosed one-story riding arena, a one-story barn with a caretaker's apartment, and a one-story ranch style home on the three lower lots. The judge found that Wylie proposes to use the stable as a "dressage facility, meaning that horses and riders will be trained in the dressage style which requires that horse and rider train to compete singly and not in groups or classes." There will also be fifteen parking spaces beside the barn. To exercise the horses, she plans to build seven fenced paddocks of various sizes and an outdoor sand riding rink. The upper eighteen-acre parcel will contain a portion of the sand riding rink and a portion of two riding paddocks. The remainder of the upper parcel is undeveloped

---

[6]We take judicial notice of this decision as requested by the Batemans. That decision was not appealed.

and includes wetlands. Wylie's plans do not extend any road into the upper parcel. The gravel driveway she plans to build will be constructed over the forty-foot wide easement and will be twenty feet wide. It would lead into the lower three parcels of land where the buildings are situated. Wylie plans to light the driveway and plant shrubbery to minimize the effect of the light on the Batemans. The structures Wylie plans to build are situated from 700 to more than 1,000 feet away from structures on the Batemans' property.

2. *Overloading of the easement.* The Batemans take issue with the Superior Court's finding that the forty-foot wide easement "can be used to access the entire locus," including the upper parcel. Relying on decisions in which appurtenant easements were negotiated by private parties without referencing after-acquired property, the Batemans argue that this case is governed by the principle that "after-acquired property . . . may not be added to the dominant estate without the express consent of the owner of the servient estate [and] absent such consent, the use of an easement to benefit property located beyond the dominant estate constitutes an overburdening of the easement." *McLaughlin* v. *Selectmen of Amherst*, 422 Mass. 359, 364 (1996).

"The principles of interpretation designed to give effect to the express or implied intent of parties contracting for or acquiring an interest in land, however, are, in general, inapplicable to eminent domain proceedings." *Mugar* v. *Massachusetts Bay Transp. Authy.*, 28 Mass. App. Ct. 443, 445 (1990). The Batemans never negotiated the original easement or staked out the extent of their rights; rather, the Commonwealth took the easement in the Batemans' land to remedy the elimination of access and egress caused by the I-95 takings.

"The basic question where the interest was acquired by eminent domain is what interest the taking authority intended to acquire [and in our case, convey] as shown by the relevant documents." *Boorstein* v. *Massachusetts Port Authy.*, 370 Mass. 13, 17 n.6 (1976). The documents unequivocally provide an easement granting access and egress rights over the Bateman property to benefit the bottom three parcels. Less obvious is whether the easement is overloaded when the activities on the

dominant estate benefitting from the easement extend into after-acquired property not explicitly addressed in the easement. Given the special circumstances of this case, we conclude that there is no overloading of the easement.

Here, a second easement burdens the Bateman property providing access and egress for the upper parcel. As the Land Court judge found, "Pursuant to the express terms of the grant, the servient estate is to contain a right of way that provides access to the dominant estate 'at all times without let or hindrance.' " The language of the easement was found to express a grant "in general terms because it does not limit access to a particular use or scope." Belkin *vs.* Bateman, *supra.* The second easement, therefore, authorizes access to the upper parcel through the Bateman estate for the activities at issue.[7] Furthermore, this easement runs adjacent to the forty-foot wide easement. Thus, as a practical matter, given the existence of the second unrestricted, adjacent easement, no new burden, not previously authorized, would be imposed on the Bateman estate.[8]

It also does not make any sense to require the use of two separate adjacent easements to the same horse farm, with the easement to be used dependent upon whether a horse may be frolicking in a particular part of a paddock. We, therefore, agree that the forty-foot wide easement has not been overloaded; the trial judge correctly concluded that the easement may be used to benefit the entire locus.

3. *Variance and special permit.* The Batemans further claim

[7]Although the specific issue of the use of the second easement for a riding academy and public stable was not before the Land Court in Belkin *vs.* Bateman, *supra,* that decision, as explained above, demonstrates that the easement is unrestricted and would encompass such a use. See Part 4, *infra.*

[8]Wylie's proposed activities are also concentrated on the dominant Belkin estate with only a spillover onto the after-acquired upper parcel. All the buildings, parking areas, and roadway are to be located on the dominant estate. Contrast *Murphy* v. *Mart Realty of Brockton, Inc.,* 348 Mass. 675, 679 (1965); *McLaughlin* v. *Selectmen of Amherst,* 38 Mass. App. Ct. 162, 168-169 (1995), *S.C.,* 422 Mass. 359 (1996). The activities proposed to be undertaken on the after-acquired property are relatively limited and are part and parcel of the activities centered on the dominant estate. Contrast *Randall* v. *Grant,* 210 Mass. 302 (1911). To conclude that this spillover onto the upper parcel of portions of two of seven paddocks and a part of the sand rink overloads the forty-foot wide easement would elevate form over substance where the upper parcel also benefits from an unrestricted, adjacent easement over the Bateman estate.

that the Superior Court judge erred in upholding the board's grant of a variance from the by-law's frontage requirements and grant of a special permit to construct more than one building. The board found that Wylie had met the four requirements set out in G. L. c. 40A, § 10, for a variance: (1) "that owing to circumstances relating to soil condition, shape, or topography of such land" (2) "a literal enforcement of the provisions of the ordinance or the by-law would involve substantial hardship, financial or otherwise, to the petitioner"; (3) the "relief may be granted without substantial harm to the public good"; and (4) the relief may be granted "without nullifying or substantially derogating from the intent or purpose of such ordinance or by-law." See *Warren* v. *Zoning Bd. of Appeals of Amherst*, 383 Mass. 1, 9 (1981). The judge upheld the board's decision. There was no error.

In upholding the grant of the variance, the judge found that the "shape of the lot resulted wholly from the actions of the Commonwealth through its powers of eminent domain which deprived the locus of any frontage and was created by no fault of the current or previous owners." The judge further found that the unique shape of the lot was not characteristic of other lots in the area. She also found that, without a variance from the by-law's frontage requirements, the entire substantial locus would be unbuildable. These findings are amply supported by the evidence and the reasonable inferences that can be drawn therefrom.

The legal conclusion the judge drew from her findings is equally supported by our case law, in which we have held that an oddly shaped lot with no frontage created a substantial hardship when the lack of frontage and shape resulted through no fault of the appellant. See *Paulding* v. *Bruins*, 18 Mass. App. Ct. 707, 711 (1984) (finding that pork chop-shaped lot was a factor contributing to uniqueness); *Adams* v. *Brolly*, 46 Mass. App. Ct. 1, 4 (1998) (owner did not create his own hardship where taking precluded the consummation of land swap designed to secure necessary frontage; variance properly granted for " 'pork chop' lot unlike any other in the neighborhood").

Similarly, the judge's conclusion that the variance will not harm the public good was well supported. The judge found that

any increase in traffic would be minimal. She emphasized the following: (1) Wylie proposes to use the stable as a dressage facility, which means that riders will typically come to the locus singularly or in small groups; (2) even for larger events, the number of cars traveling to the farm will remain small, as the parking lot accommodates only fifteen cars; and (3) the board restricted the horse farm's hours of operation, so traffic will be limited at night. The judge's conclusion that the grant would not "nullify or substantially derogate the intent or purpose of the by-law" also had adequate factual basis. The judge found that the locus exceeded the by-law requirements in every aspect except frontage and that the proposed use would maintain the locus's rural character.

As for the special permit, the judge found that the thirty-six acre size of the locus greatly exceeded the 40,000 square feet necessary for the erection of a single house. This finding supports the judge's conclusion that Wylie satisfied her burden of showing that the board's decision allowing three buildings on the locus was not arbitrary, capricious, unreasonable, or based on legally untenable grounds. See *Knott* v. *Zoning Bd. of Appeals of Natick*, 12 Mass. App. Ct. 1002, 1004 (1981) (burden of going forward with evidence rests on the party seeking to establish the validity of a variance or special permit); *ACW Realty Mgmt., Inc.* v. *Planning Bd. of Westfield*, 40 Mass. App. Ct. 242, 246 (1996) (if supported by facts found by the trial judge, the board's decision may be disturbed only if it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary).

4. *Agricultural use.* Finally, the Batemans argue that Wylie requires a special permit to use the locus as a public stable and riding academy. They argue that the board and the court erred in concluding that the proposed use was agricultural and thus exempt from the proscriptions of the town's zoning by-law. General Laws c. 40A, § 3, provides as follows: "[N]or shall any [zoning] ordinance or by-law prohibit, unreasonably regulate or require a special permit for the use of land for the primary purpose of agriculture." Wylie's proposed use falls squarely within this exemption. See *Steege* v. *Board of Appeals of Stow*, 26 Mass. App. Ct. 970 (1988).

Wylie proposes to use the locus to raise, train, and board her own and others' horses. She also plans to coach riders, and to offer lessons and horses to people who do not own their own horses. The *Steege* decision concluded that a locus used "for raising, training, and boarding of horses; for giving riding lessons; and for the riding use of owners of the boarded horses" fell under the agricultural use exemption. See *Steege* v. *Bd. of Appeals of Stow*, 26 Mass. App. Ct. at 970, 972. In that case, we noted that including such use in a definition of agriculture corresponded with "[the word's] plain and ordinary meaning and its consistent and well-established . . . definition in other statutory contexts." *Id.* at 972. Cf. *Sturbridge* v. *McDowell*, 35 Mass. App. Ct. 924, 925-926 (1993).[9] Wylie's use is agricultural; she therefore requires no special permit.

*Judgment affirmed.*

---

[9]Contrary to the Batemans' argument, we have not held that a farm must generate $500 in sales to qualify for the G. L. c. 40A, § 3, exemption. In *Steege*, the plaintiff's ability to qualify for G. L. c. 61A, § 3, tax status was one factor considered by the court in reaching its conclusion that the use was agricultural. See *Steege* v. *Board of Appeals of Stow, supra* at 971-972. A riding stable of the size and type proposed here would satisfy such a requirement without reference to the parcels' status under G. L. c. 61A, § 3.