461 Mass. 469 (2012)                                    469

Shirley Wayside Limited Partnership *v.* Board of Appeals of Shirley.

SHIRLEY WAYSIDE LIMITED PARTNERSHIP *VS.* BOARD OF
APPEALS OF SHIRLEY.

Suffolk. November 9, 2011. - February 7, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Zoning,* By-law, Special permit, Judicial review, Mobile home, Nonconform-
ing use or structure, Setback, Frontage, Lot size. *Practice, Civil,* Retroac-
tivity of judicial holding.

Discussion of the standard of judicial review of a decision of a town zoning
    board denying an application for a special permit. [474-475]
This court concluded that under a town zoning bylaw, a mobile home park
    constituted an "other use" (rather than a single-family or two-family
    home) that was expressly prohibited, and that when operated as a preexist-
    ing nonconforming use, a mobile home park (rather than each individual
    mobile home contained therein) was subject to the bylaw's minimum lot
    size requirements; therefore, an existing mobile home park owned by the
    plaintiff that exceeded the minimum lot sizes of the two districts within
    which it was located satisfied the minimum lot size requirements under the
    bylaw. [475-479]
This court concluded that, in circumstances in which the plaintiff owner of a
    preexisting nonconforming mobile home park challenged the denial by the
    defendant zoning board of appeals of the plaintiff's application for a
    special permit to expand the park's number of mobile home units, and in
    which both parties assumed throughout the permitting process and litiga-
    tion that only board of health regulations, rather than the more stringent
    town zoning bylaw, governed the setback requirements of the park, equit-
    able considerations warranted the limitation to prospective application only
    of the court's holding that the bylaw's setback requirements controlled.
    [479-482]
A Land Court judge properly concluded that the denial by the defendant town
    zoning board of appeals of the plaintiff's application for a special permit to
    expand a preexisting nonconforming use by adding fourteen mobile home
    units to a sixty-five unit mobile home park was arbitrary and capricious,
    where the record failed to demonstrate that, as to any generalized concerns
    about density not encompassed in lot size, frontage, and setback require-
    ments, the expansion would be substantially more detrimental to the
    neighborhood than the existing mobile home park [482-483]; and where,
    given that the town's zoning bylaw permitted expansion of nonconforming
    uses, the board was not free to deny the proposed expansion simply because
    it expanded a nonconforming use [484-485]; further, there was no error in
    the judge's findings with respect to traffic impact [483-484].

CIVIL ACTION commenced in the Land Court Department on November 1, 2005.

The case was heard by *Keith C. Long*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Julie McNeill* for the plaintiff.

*Ellen Callahan Doucette* for the defendant.

*Robert Kraus & Joseph E. Kelleher*, for Massachusetts Manufactured Housing Association, Inc., amicus curiae, submitted a brief.

CORDY, J. Shirley Wayside Limited Partnership (Wayside), owner of a mobile home park in the town of Shirley, sought a special permit from the town's zoning board of appeals (board) in order to expand its mobile home park, a lawfully nonconforming use, from sixty-five to seventy-nine units. The board refused to grant the special permit, finding that Wayside had failed to establish that the expansion would not be substantially more detrimental to the neighborhood than the existing mobile home park. Deeming the concerns articulated by the board to be mere pretexts and unsupported by the evidence, a judge in the Land Court overturned the board's decision and ordered the board to issue the special permit. A divided panel of the Appeals Court reversed, finding that the board acted within its discretion because of the density of the proposed expansion. *Shirley Wayside Ltd. Partnership* v. *Board of Appeals of Shirley*, 78 Mass. App. Ct. 19 (2010) (*Shirley Wayside*). We granted Wayside's application for further appellate review.

We conclude that the expansion complies with the zoning bylaw at issue, which we interpret as imposing minimum lot size dimensions on the entire mobile home park and not on individual mobile homes, governed only by board of health regulations.[1] We further agree with the Land Court judge that

---

[1] We also conclude that the expansion complies with the frontage requirement of the zoning bylaw. With respect to the bylaw's setback requirement, the proposed expansion satisfies the twenty-foot setback requirement of the board of health regulations, but in one location it might encroach on the thirty-foot setback requirement of the zoning bylaw. Because neither party anticipated that the more stringent setback requirement of the zoning bylaw would apply, for reasons of equity we decline to enforce it retrospectively.

461 Mass. 469 (2012)                                    471

Shirley Wayside Limited Partnership *v.* Board of Appeals of Shirley.

there is no evidence that either the density within the mobile home park expansion or the modest increase in traffic will be detrimental to the surrounding neighborhood. We therefore affirm the judgment of the Land Court judge.[2]

1. *Background.* We summarize the essential, undisputed facts. Wayside owns and operates a mobile home park on approximately twenty acres of land partially located in a residence 3 (R3) zoning district and partially in a residential rural (RR) zoning district. Minimum lot area for single-family homes and most other uses is 15,000 square feet in the R3 district and 80,000 square feet in the RR district.[3] § 3.1 of the Revised Protective Zoning By-law of the Town of Shirley (1994) (bylaw). The lot also is located in a water supply protection zone, and it contains a portion of a pond in one corner.

The mobile home park currently contains sixty-five mobile homes, one of which is abandoned. Wayside owns the land, and the residents, who own the mobile homes, pay a monthly rental charge for the space they occupy. Wayside builds and maintains its own roads, is responsible for snow removal, and contracts for its own trash removal. Around the end of 2003, the park was connected to town sewer and water, for which it is paying the town a betterment assessment.

The park is restricted to persons of age fifty-five years and over. As set forth in the park's rules and regulations, at least one member of every family must be aged fifty-five, and no guest under the age of fifty-five may stay longer than fourteen days. In 2003, Wayside's sixty-four functioning mobile homes housed ninety-six people; four were children.

The park is accessed from Clark Road, a two-lane public way. Clark Road is connected to other roads but is not a main thoroughfare. At trial, Wayside presented evidence of trip generation in the form of a vehicle counting study. The study showed that 434 vehicles per day currently make use of Clark Road.

[2]We acknowledge the amicus brief of the Massachusetts Manufactured Housing Association, Inc.

[3]In the R3 district, minimum frontage is one hundred feet and minimum setback is thirty feet. In the RR district, minimum frontage is 225 feet and minimum setback is fifty feet. § 3 of the Revised Protective Zoning By-law of the Town of Shirley (bylaw).

Wayside presented expert testimony at trial gauging the proposed impact of the expansion on traffic. The expert predicted that the proposed expansion would generate an additional sixty to seventy-five trips per day. The board neither performed its own traffic study nor had the Wayside traffic study reviewed by its own consultant.

In 1985, Shirley amended its zoning bylaw and deleted mobile home parks as a permitted use in all zoning districts. Wayside, which has existed since the 1950s, was protected as a preexisting nonconforming use. See G. L. c. 40A, § 6. Shirley supervises Wayside and the other remaining mobile home parks through its local board of health regulations. See G. L. c. 140, § 32B (authorizing local boards of health to regulate manufactured housing communities). The board of health regulations require 5,000 square feet of space for each mobile home, on a lot containing minimum dimensions of fifty by one hundred feet. There must be thirty feet of clearance between individual mobile homes and twenty feet of setback between mobile homes and the park boundary. Wayside's sixty-four functioning mobile homes, having been laid out prior to the promulgation of these regulations in 1960, do not and are not required to comply with these dimensions.

The bylaw permits expansion of preexisting nonconforming uses if the landowner satisfies three conditions. First, the expansion of a nonconforming structure or use "shall not exceed twenty-five percent (25%) of its area on said lot" supporting that structure or use.[4] § 2.8.4 of the bylaw. Second, the board must find "that such extension, alteration, reconstruction or repair is not substantially more detrimental to the neighborhood than the existing non conforming structure or use."[5] *Id.* Finally, the expansion "must be physically located within the perimeter of the lot as said perimeter existed and upon which the non

---

[4]As applied to this case, the Land Court judge interpreted this provision as requiring the square footage of the new mobile homes to be no greater than twenty-five per cent of the square footage of the existing mobile homes. Neither party has challenged this interpretation.

[5]This requirement mirrors G. L. c. 40A, § 6, which authorizes local zoning boards to permit expansion of nonconforming structures or uses on a finding that "such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood."

conforming structure or use was situated on the date the structure or use originally became non conforming." *Id.* In addition, under § 4.13.3 of the bylaw, expansions in water protection zones may increase the total area impervious to drainage (i.e., paved roads and buildings) by no more than twenty-five per cent.

In 2005, Wayside applied for a permit to replace the abandoned mobile home and to add an additional fourteen mobile homes. The proposed expansion will be toward the rear of the property, in an area well screened by trees and other buffers.

It is agreed that Wayside's proposal satisfies the first and third conditions for expansion — the square footage of the mobile homes would increase by 23.8 per cent, and the proposed expansion is entirely within the borders of Wayside's property. The proposal also satisfies the water protection bylaw, because the expansion of the area impervious to drainage would be 24.9 per cent. The proposed expansion will abide by all current board of health regulations, including those respecting lot size and setback. Each new mobile home will be situated on a 5,000 square foot lot, and the closest distance between a proposed mobile home and an abutting property line will be twenty-two feet, two feet more than required by the board of health regulations. Nevertheless, the board denied Wayside's application, finding that Wayside "did not satisfy the burden that this expansion will not be more substantially detrimental to the neighborhood due to the density of the expansion and the encroachment of the [twenty-five per cent] rule."

In reaching this conclusion, the board considered the following factors: (1) "present zoning regulations do not allow additional [mobile homes] in the Town of Shirley"; (2) "the impact of the additional residents on the area and the infrastructure of the Town of Shirley, in particular the possible economic burden on the school system, as the tax base for [mobile homes] is much less than the tax base for residential homes"; (3) encroachment on wetlands; (4) groundwater runoff; (5) density of the existing area and expansion area; (6) property devaluation to abutters; (7) the heavy amount of traffic on the road; and (8) the closeness of the proposed expansion to the twenty-five per cent allowed under the rule, which left no room for error.

Following a trial de novo, the Land Court judge addressed

each of the reasons offered by the board in denying the permit. He concluded that no rational board could have drawn the same conclusions and that, accordingly, the board's decision was arbitrary and capricious. The judge vacated the decision and remanded with instructions to issue a special permit.

A divided panel of the Appeals Court reversed. *Shirley Wayside, supra* at 23. The court agreed with the Land Court judge that the evidence did not support the board's expressed rationale in most respects. *Id.* at 22-23. Nonetheless, the court concluded that the board's concern for increased density furnished adequate justification for its decision to deny the permit. *Id.* at 23. It emphasized that the proposed plan does not comply with the density requirements of the zoning bylaw in the relevant residential districts. *Id.* The dissent opined that those requirements apply only to single-family homes; that individual mobile homes need only comply with the board of health regulations; and that Wayside's proposed expansion meets those requirements. *Id.* at 25 (Brown, J., dissenting).

2. *Discussion.* We agree with the Land Court judge that most of the board's stated concerns were vague, speculative, or otherwise unsupported by the evidence. See *id.* at 22-23. We focus only on the ground that the Appeals Court concluded was sufficient — density — and on an alternative ground that the board urges before this court — traffic.

a. *Standard of review.* Judicial review of a local zoning board's denial of a special permit involves a combination of de novo and deferential analyses. *Wendy's Old Fashioned Hamburgers of N.Y., Inc.* v. *Board of Appeal of Billerica,* 454 Mass. 374, 381 (2009) (*Wendy's*), citing *Pendergast* v. *Board of Appeals of Barnstable,* 331 Mass. 555, 558 (1954). The trial judge makes his own findings of facts and need not give weight to those the board has found. See G. L. c. 40A § 17; *Pendergast* v. *Board of Appeals of Barnstable, supra* at 558-559. The judge then "determines the content and meaning of statutes and by-laws and . . . decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application" (citations omitted). *Britton* v. *Zoning Bd. of Appeals of Gloucester,* 59 Mass. App. Ct. 68, 73-74 (2003) (*Britton*).

We accord deference to a local board's reasonable interpretation of its own zoning bylaw, *Wendy's, supra,* citing *Manning v. Boston Redev. Auth.,* 400 Mass. 444, 453 (1987), with the caveat that an "incorrect interpretation of a statute . . . is not entitled to deference." *Atlanticare Med. Ctr.* v. *Commissioner of the Div. of Med. Assistance,* 439 Mass. 1, 6 (2003), quoting *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.,* 412 Mass. 340, 345-346 (1992).

After determining the facts and clarifying the appropriate legal standards, the judge determines whether the board has applied those standards in an "unreasonable, whimsical, capricious or arbitrary" manner. *Wendy's, supra* at 382, quoting *Roberts* v. *Southwestern Bell Mobile Sys., Inc.,* 429 Mass. 478, 487 (1999). This stage of judicial review "involves a highly deferential bow to local control over community planning." *Wendy's, supra,* quoting *Britton, supra* at 73. The board is entitled to deny a permit even "if the facts found by the court would support its issuance." *Wendy's, supra* at 383, quoting *Britton, supra* at 74. The judge nonetheless should overturn a board's decision when "no rational view of the facts the court has found supports the board's conclusion." *Wendy's, supra* at 383, quoting *Britton, supra* at 74-75. Deference is not appropriate when the reasons given by the board lacked "substantial basis in fact" and were in reality "mere pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law." *Vazza Props., Inc.* v. *City Council of Woburn,* 1 Mass. App. Ct. 308, 312 (1973).

On appellate review, the judge's findings of fact will not be set aside "unless they are 'clearly erroneous' or there is 'no evidence to support them.' " *Wendy's, supra,* quoting *DiGiovanni* v. *Board of Appeals of Rockport,* 19 Mass. App. Ct. 339, 343 (1985). We review the judge's determinations of law, including interpretations of zoning bylaws, de novo. See *Needham* v. *Winslow Nurseries, Inc.,* 330 Mass. 95, 99 (1953); *Hebb* v. *Lamport,* 4 Mass. App. Ct. 202, 209 (1976).

With these principles in mind, we turn to the merits, beginning with density. Local concerns regarding density are reflected in zoning requirements regarding lot size, frontage, and setback.

b. *Lot size.* Any expansion of a preexisting nonconforming

use must comply with applicable zoning bylaws. G. L. c. 40A, § 6. See *Cox* v. *Board of Appeals of Carver*, 42 Mass. App. Ct. 422, 426 (1997) (*Cox*), quoting *Rockwood* v. *Snow Inn Corp.*, 409 Mass. 361, 364 (1991). In *Cox*, *supra* at 423, the owner of a 22.67 acre mobile home park sought to expand onto a 2.53 acre tract of land across the street. The zoning bylaw of Carver required one hundred acres for the operation of a mobile home park. *Id.* The Appeals Court concluded that the local board exceeded its authority and acted contrary to law when it granted the mobile home park a special permit, because the new tract failed to meet the bylaw's minimum lot size requirement for a mobile home park. *Id.* at 426.

The parties dispute how the principle of *Cox* applies to this case, which differs in two critical respects. First, rather than annexing a new lot, Wayside is expanding within its existing lot. Accordingly, Wayside argues, it is exempt from any dimensional requirements that may apply to new lots. The board downplays the significance of this distinction, however, because Wayside will be expanding from the R3-zoned portion of its property into the RR-zoned portion.

Second, because mobile home parks are prohibited in Shirley, the bylaw contains no specific guidelines as to minimum lot size for mobile home parks (as they did in *Cox*). In the absence of specific guidance, the board submits that the lot size requirements of single-family homes would apply to each of the new mobile homes. Wayside argues that the bylaw does not subject mobile homes to minimum lot size requirements at all. In Wayside's view, the town dictates the minimum size of mobile home parks only through board of health regulations. Because Wayside's expansion will fully comply with those regulations, its application should have been granted.

A careful study of the bylaw exposes a third reading of the lot size requirements: the minimum lot size requirement applies to the entire mobile home park, rather than to each individual mobile home.[6] Because the size of the entire park far exceeds

---

[6]We develop our analysis with respect to lot size because the parties have briefed it most extensively. Our analysis applies equally to the bylaw's frontage and setback requirements. That is, the entire park, rather than individual units, must abide by the frontage and setback requirements of the relevant zones. See part 2.c, *infra*.

the minimum lot size and will continue to do so after the proposed expansion, the expansion satisfies the bylaw.

We determine the meaning of a bylaw "by the ordinary principles of statutory construction." *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283, 290 (1981). We first look to the statutory language as the "principal source of insight into legislative intent." *Adoption of Daisy*, 460 Mass. 72, 76 (2011), quoting *Water Dep't of Fairhaven* v. *Department of Envtl. Protection*, 455 Mass. 740, 744 (2010). When the meaning of the language is plain and unambiguous, we enforce the statute according to its plain wording "unless a literal construction would yield an absurd or unworkable result." *Adoption of Daisy, supra*, quoting *Boston Hous. Auth.* v. *National Conference of Firemen & Oilers, Local 3*, 458 Mass. 155, 162 (2010). We "endeavor to interpret a statute to give effect 'to all its provisions, so that no part will be inoperative or superfluous.' " *Connors* v. *Annino*, 460 Mass. 790, 796 (2011), quoting *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010).

Before commencing an analysis of the bylaw, we note that the board of health regulations have little bearing on our interpretation. Licensing laws for mobile homes, authorized pursuant to the State's police power, and zoning bylaws, promulgated by "cities and towns to protect the health, safety and general welfare of their present and future inhabitants," G. L. c. 40A, § 1A, operate in separate and mutually exclusive spheres. See *Granby* v. *Landry*, 341 Mass. 443, 446 (1960), and cases cited (licensing scheme of G. L. c. 140 does not preempt zoning restrictions on trailer parks). Wayside's compliance with health regulations therefore cannot substitute for compliance with the zoning bylaw. *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 167 (1977) ("holding of a license or permit . . . does not entitle the licensee or permittee to operate that business in a place where such a business is prohibited by zoning by-laws or ordinances").[7] We therefore confine our inquiry to the four corners of the bylaw.

---

[7]The bylaw also explicitly provides that it supersedes all other bylaws relevant to land use, presumably including the board of health regulations. "Where any provision of this By-Law imposes a greater restriction upon the development or use of land or structures than is imposed by other by-laws, the provisions of this By-Law shall control." § 12.1 of the bylaw.

We begin by reviewing the bylaw's lot size requirements for various uses. The proposed expansion is partially located in a residence 3 (R3) zoning district and partially in a rural residential (RR) district. The minimum lot size in an R3 zone is 15,000 square feet for a single-family home, 19,000 square feet for a two-family home, and 15,000 square feet for "[o]ther [u]ses." § 3.1 of the bylaw. The minimum lot size in an RR zone is 80,000 square feet for a single-family home, 100,000 square feet for a two-family home, and 80,000 square feet for "[o]ther [u]ses." *Id.*

Next, we must determine whether Wayside's expansion constitutes a single-family home, two-family home, "[o]ther [u]ses," or none of the above. Based on our long-standing precedent, we readily rule out single-family home. An individual mobile home, even when rendered immobile through removal of its tires, cannot be characterized as a single-family dwelling for the purposes of zoning bylaws. See *Manchester* v. *Phillips*, 343 Mass. 591, 594-596 (1962); *Marblehead* v. *Gilbert*, 334 Mass. 602, 604 (1956). See also § 2.6 of the bylaw (describing permitted use as "[d]etached single-family dwelling"); *id.* at § 11.12 (explicitly excluding mobile homes from the definition of "[d]welling [u]nit").[8] Mobile homes are even more obviously not two-family homes.

We conclude, based on the plain language of the bylaw, that Wayside is subject to density regulations as an "other use." We interpret the term "[o]ther [u]ses" by reference to the bylaw's schedule of uses. This table sets out all the "uses" of land that are permitted or prohibited in each of the zoning districts of Shirley. See § 2.6 of the bylaw. One such use, prohibited in all zoning districts, is "[m]obile home park."[9] By the plain language of the bylaw, then, a mobile home park is an "other use" of land, albeit usually a prohibited one.[10]

---

[8]While we accord deference to the board's reasonable interpretation of its own bylaw, we comfortably reject the board's interpretation when it contradicts both long-standing precedent and the bylaw's own definitions.

[9]"Mobile [h]ome [p]ark" is defined in the bylaw as "[a]ny lot of land upon which three (3) or more mobile homes occupied for dwelling purposes are located, including any buildings, structure, fixtures and equipment used in connection with mobile homes." § 11.21 of the bylaw. The term "mobile home" is separately defined. *Id.* at § 11.20.

[10]Even had the bylaw not explicitly characterized "mobile home park" as

There is no separate listing in the schedule of uses for "mobile home."[11] An individual mobile home may therefore exist as part of a preexisting mobile home park or as a temporary structure on a single-family parcel, but it is not considered an independent use of land.

When operated as a preexisting nonconforming use, each mobile home *park* (not each individual mobile home) is accordingly subject to the minimum lot size requirements. Wayside is indisputably a "mobile home park." Because Wayside's twenty-acre property far exceeds the minimum lot size in both the R3 and RR district, Wayside satisfies the minimum lot size requirement.

c. *Frontage and setback.* Having established that Wayside's expansion will continue to comply with the lot size requirement, we turn to frontage and setback. The mobile home park easily satisfies the frontage requirement of one hundred feet in the R3 zone, which is the only zone in which it fronts a public way. With respect to setback, under the bylaw, no "principal or accessory building or structure" may be constructed in a location that fails to conform with the appropriate setback requirements. § 3.1 of the bylaw. A mobile home is a "structure."[12] In the R3 zone, minimum setback is thirty feet for a front or rear yard and twenty feet for a side yard. *Id.*

---

an "other use," we would likely have reached the same result based on the policies of zoning. Density regulations serve independent and important public interests that cannot be fully achieved through use restrictions. See *Bransford* v. *Zoning Bd. of Appeals of Edgartown*, 444 Mass. 852, 860-861 (2005) (Greaney, J., concurring), and authorities cited (reasoning and result subsequently adopted in *Bjorklund* v. *Zoning Bd. of Appeals of Norwell*, 450 Mass. 357, 358 [2008]); *Opinion of the Justices*, 234 Mass. 597, 604-605 (1920). Logically, there is no reason why protection as a preexisting nonconforming use should exempt a lot from generally applicable density regulations, or vice versa. Cf. G. L. c. 40A, § 3, second and third pars. (prohibiting towns from categorically barring certain uses of land, but permitting towns to impose on those uses reasonable density regulations).

[11]The bylaw mentions mobile homes independent of mobile home parks in a single context — authorizing temporary dwelling in a mobile home for up to twelve months during the construction or rebuilding of a permanent structure. § 4.4.1 of the bylaw.

[12]A "structure" is "[a] combination of materials to form a construction including, among others, buildings, stadiums, tents, reviewing stands, platforms, stagings, observation towers, water tanks, play tower, swimming pools, trestles, sheds, shelters, fences, display signs, courts for tennis or similar games, backstops, backboards." § 11.29 of the bylaw.

The compatibility of the expansion with setback requirements at the mobile home park's borders was not litigated below, and the Land Court judge made no relevant findings. It appears from the record, however, that one of the new units in the R3 zone will be located twenty-two feet from the rear of an adjoining lot.[13] This layout satisfies the twenty-foot setback requirement of the board of health regulations. If the relevant section of the mobile home park is characterized as a "front yard" or "rear yard," however, under the bylaw the expansion would require a thirty-foot setback. The board could thus have appropriately denied the application for expansion, notwithstanding the expansion's compliance with the board of health regulations. See *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 167 (1977); § 12.1 of the bylaw.

Because of the irregular shape of the rear portion of the lot, it is not immediately apparent whether this section is properly characterized as a front yard, side yard, or rear yard. See *Bianco* v. *Ashley*, 284 Mass. 20, 24-25 (1933) (determination of "rear lot line" is matter of fact, involving "exercise of sound judgment as applied to the particular neighborhood"). On this record, we could therefore remand the case to the Land Court, both to confirm the twenty-two foot measurement and to determine whether it violates the setback provision of the bylaw. In the present case, however, equitable considerations require us to forgo such a remand. When both parties assumed throughout the permitting process and litigation that only the board of health regulations governed setback, applying the more stringent zoning bylaw would inflict an unfair burden on Wayside.

In property cases, as well as contract cases, we may make an exception to our usual rule and apply holdings only prospectively. Retroactive application may not be appropriate in these areas, "in which reliance upon existing judicial precedent often influences individual action." *Papadopoulos* v. *Target Corp.*, 457 Mass. 368, 385 (2010), quoting *Halley* v. *Birbiglia*, 390 Mass. 540, 545 (1983). "[I]t is sometimes necessary to depart from

---

[13]An engineer who drafted the plan of the expansion stated at the board hearing that one proposed unit is twenty-two feet from an abutter's property line. Based on the plan submitted in evidence, this appears to be the distance between proposed unit no. fourteen and the rear of 67 Clark Road.

the general rule of retroactivity, in order to protect the reasonable expectations of parties." *Schrottman* v. *Barnicle*, 386 Mass. 627, 631 (1982), and cases cited. To determine whether a case warrants an exception to the general rule of retroactivity, we examine three factors: "the extent to which the decision creates a novel and unforeshadowed rule; . . . the benefits of retroactive application in furthering the purpose of the new rule; and . . . the hardship or inequity likely to follow from retroactive application." *Tamerlane Corp.* v. *Warwick Ins. Co.*, 412 Mass. 486, 490 (1992), quoting *Schrottman* v. *Barnicle, supra* at 631-632.

In the present case, application of the bylaw's setback requirements to Wayside's expansion is certainly novel and unforeseen. As noted above, we have adopted our construction of the bylaw sua sponte. See *supra* at 476. Moreover, during the board hearings, when a board member expressed concern about the distance between the new units and property of abutters, he cited only the twenty-foot setback requirement of the board of health regulations. Not a single board member asserted that the setback requirements of the zoning bylaw would apply. Even in the course of litigation, the board specifically advocated for the application of the lot size requirements of single-family homes to individual mobile homes, but it never argued the same with respect to setback. When neither party has suggested adoption of a new rule, we are not required to impose it on them. See *Tucker* v. *Badoian*, 376 Mass. 907, 919 (1978) (Kaplan, J., concurring) ("We do not apply the new standard to the instant case [which would entail reversing the judgment appealed from and remanding the matter for further proceedings] because the parties did not raise the question of a departure from the existing rule and were content to litigate within its bounds").

As for the second factor, the objectives of setback regulation will not be dramatically improved by an additional eight feet of setback. The purposes of zoning promoted by setback regulation include: to "lessen congestion in the streets; . . . to secure safety from fire, flood, panic and other dangers; to provide adequate light and air; to prevent overcrowding of land, [and] to avoid undue concentration of population." M. Bobrowski, Massachusetts Land Use and Planning Law § 12.07[C] (3d ed.

2011), quoting St. 1975, c. 808, § 2A. Here, the boundary line in question is screened by trees, the house of the abutter is in an opposite corner of the lot, and, as discussed *infra*, with respect to traffic, the neighborhood is not heavily settled. While a potential deficiency of eight feet out of thirty is far from de minimis; see *Warren* v. *Zoning Bd. of Appeals of Amherst*, 383 Mass. 1, 11 (1981), in the present case it is not egregious.

Last, denying the special permit because of the thirty-foot setback requirement would impose considerable hardship on Wayside. The mobile home park contains an expansive undeveloped area behind the proposed expansion. Had Wayside known that the larger setback requirement applied to its mobile home park, it would certainly have submitted a complying plan over six years ago. Forcing Wayside to seek approval of a substantially identical plan today from a town that is hostile to its project, on the basis of a provision that neither party anticipated would apply, is plainly inequitable.

We have previously declined to enforce a minor infraction of a setback bylaw when there was "no suggestion that anyone participating in this confused situation acted otherwise than in good faith"; there was "no showing of any public advantage which could result from a rigid and inequitable enforcement of the by-law"; and "[s]ubstantial hardship and expense would be imposed" on the landowner. *Marblehead* v. *Deery*, 356 Mass. 532, 537-538 (1969). All those factors are present here. We therefore conclude that, even if the proposed expansion violates the setback bylaw as we have interpreted it, we decline to apply that bylaw retrospectively to this project.[14]

To the extent that the board expressed any generalized concerns about density not encompassed in lot size, frontage, and setback, the record fails to demonstrate that the expansion would be substantially more detrimental to the neighborhood than the existing mobile home park. The new mobile homes will be at the rear of a twenty-acre lot, and they will be well screened by trees and other buffers. The interior of the expansion will conform with all board of health regulations. While individual mobile

---

[14]Of course, nothing in the above discussion is meant to discourage Wayside from voluntarily amending its plan to conform with the thirty-foot setback requirement.

homes will be more densely situated than a comparable collection of single-family houses, Shirley has chosen not to regulate the interior of mobile home parks through its zoning bylaw. We therefore agree with the Land Court judge that no rational view of the facts supports the board's conclusion, and that the board's conclusion was therefore arbitrary and capricious. See *Wendy's*, *supra* at 383.

d. *Traffic.* The board alternatively claims that its denial of the expansion was justified on account of increased traffic. Wayside's traffic count showed that 434 vehicles per day make use of Clark Road. At trial, Wayside's expert testified that the proposed expansion would generate between sixty and seventy-five additional trips per day.[15] Four witnesses testified about their personal experiences regarding traffic around Wayside: Wayside's owner, Wayside's manager, a real estate appraiser, and a member of the Shirley board of health. None of them had experienced any traffic problems driving on Clark Road or entering and exiting the mobile home park. Based on this testimony, the Land Court judge concluded that "the evidence neither shows a heavy amount of traffic currently on Clark Road, nor that the proposed expansion of Wayside Estates will have much [e]ffect on it, and no rational board could conclude otherwise."

The judge's findings with respect to traffic impact have evidentiary support and are not clearly erroneous. We therefore decline to set them aside. See *Wendy's*, *supra* at 387 n.32; *Bateman* v. *Board of Appeals of Georgetown*, 56 Mass. App. Ct. 236, 241-242 (2002).

The board argues that, because there will be a measurable increase in traffic, "[i]t is the board's evaluation of the seriousness of the problem, not the judge's, which is controlling," quoting *Copley* v. *Board of Appeals of Canton*, 1 Mass. App. Ct. 821, 821 (1973). In that case, however, "the evidence indicated

---

[15]The expert made use of the Institute of Transportation Engineer's Traffic Engineering Handbook (5th ed. 1999) and Trip Generation Handbook (7th ed. 2003). According to these manuals, each mobile home generates an additional five trips per day (half in and half out), for a total of seventy-five trips for the fifteen new mobile homes. Senior adult housing generates four trips per day, resulting in sixty new trips for the entire expansion. The Land Court judge found that the senior adult housing designation would be more appropriate, given the age restrictions on the mobile home park.

that there was a basis for concern as to traffic congestion during rush hours and that traffic would probably be increased during those hours by a substantial amount as a result of the proposed apartment houses." *Id.* We defer to the board's judgment only when "reasonable minds could differ on the seriousness of a problem in relation to the issuance of a special permit." *Kinchla* v. *Board of Appeals of Falmouth*, 11 Mass. App. Ct. 927, 927 (1981). Here, no evidence contradicted the judge's finding that the impact on traffic would be de minimis.

Finally, the board argues that it was justified in rejecting the proposed expansion simply because it expands a nonconforming use. "[S]trict regulation of changes in nonconforming uses . . . is justified by policy considerations which generally favor their eventual elimination." *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 357 (2001) (*Davis*), quoting *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. 32, 39 (1991). For this reason, the *Davis* court suggested, a board's denial of a special permit based solely on "the undesirable enlargement of the existing nonconformity that would result from the plaintiffs' proposed project would itself be sustainable." *Davis, supra.*

The board reads too much into this dicta. In *Davis*, the board had made express findings that the expansion of a pier would result in the loss of boat moorings and would significantly increase the impediment to the harvesting of shellfish. *Id.* at 353-354. These were "rational and independently appropriate grounds" to deny the special permit. *Id.* at 358. Moreover, the pier at issue had been "abandoned or not used for a period of two years or more," which extinguished as a matter of law its protection as a preexisting nonconforming use. *Id.* at 353 n.9, quoting G. L. c. 40A, § 6. As a matter of equity only, the board accorded the property the status of a preexisting nonconforming use. *Davis, supra.* Under those circumstances, perhaps, it might have been acceptable for the board to deny an expansion by fiat. Here, by contrast, Shirley expressly permits expansion of nonconforming uses, subject to specific criteria laid out in its bylaws. When a bylaw permits expansion of nonconforming uses, it "unequivocally rejects the concept that nonconforming uses or structures must either fade away or remain static." *Titcomb* v. *Board of Appeals of Sandwich*, 64 Mass. App. Ct. 725,

730 (2005). The board is obligated to apply its own standards rationally. It may not conclude that an expansion will be substantially more detrimental to the neighborhood in the absence of credible evidence. See *Wendy's, supra* at 383.

3. *Conclusion.* For the foregoing reasons, and for the reasons expressed in the Appeals Court opinion with respect to the remaining concerns posed by the board, the judgment of the Land Court judge is affirmed.

*So ordered.*