NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-120

GORDON C. ANDREWS

vs.

ZONING BOARD OF APPEALS OF HALIFAX & others[1] (and two consolidated cases[2]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

These consolidated cases concern a proposed twelve-unit, multifamily project in the town of Halifax, known as Amanda's Estates.  A judge of the Land Court concluded that the site plan approval issued in 2014 required the trustees of the Party Trust (developer) to formally subdivide the property, and the 2019 modified plan submitted by the developer did not comply with the town's zoning bylaw (bylaw), which also required formal subdivision of the site.  Judgments entered directing revocation

---

[1] Corrie S. Merritt, Amanda Monti, and Edward Johnson, as trustees of the Party Trust.

[2] Andrews vs. Zoning Bd. of Appeal of Halifax & another; Andrews vs. Zoning Bd. of Appeals of Halifax & others.

of building permits issued by the town's building inspector in 2020, along with a certificate of occupancy.  For the reasons that follow, we affirm in part, vacate in part, and remand for the entry of orders directing the zoning board of appeals (board) to reinstate the 2020 building permits and the certificate of occupancy.

Background.  1.  The site and the bylaw.  The site is in the town's agricultural-residential (AR) zoning district and contains 12.5 acres.  The developer proposes to construct twelve units of multifamily housing, which are allowed by special permit in the AR district.  The units will be accessed from Elm Street, a public way, by Amanda's Way, a private way or driveway shown on the plan as terminating in a large cul-de-sac.  At the heart of this controversy are several pivotal provisions of the bylaw applicable to multifamily developments.  We set them out in detail.

The definition section of the bylaw defines a "multifamily dwelling" as "[a] building intended and designed to be occupied by more than one (1) family, living independently in separate units."  It defines "multifamily development" as a "development of three (3) or more dwelling units on a single lot of land under one (1) ownership of not less than ten (10) acres in size" (emphasis added).  The bylaw defines "lot" as "[a] single area

2

of land in one (1) ownership defined by metes and bounds or boundary lines in a <u>recorded deed or recorded plan</u>" (emphasis added).[3]

After listing "multifamily dwellings" as a use allowed in the AR district by special permit in its schedule of use regulations, § 167-7(D)(2) of the bylaw more specifically provides that "multifamily developments" are also allowed by special permit from the board in the town's AR district. Section 167-12(A) of the bylaw provides density restrictions for multifamily developments, including that "[t]he number of units in a multifamily development shall not exceed the number of acres in the parcel on which they are to be built," and that "[t]he minimum parcel size shall be ten (10) acres" -- the same as provided in the definition of "multifamily development." In addition, minimum front and rear setbacks are set at seventy-five feet and one hundred feet, respectively, and "there shall be at least one hundred (100) feet between any two (2) buildings."[4] There is no express frontage requirement. Section

---

[3] "Recorded" means "[r]ecorded or registered in the Plymouth County Registry of Deeds, or a recorded title to a parcel of land disclosed by any or all pertinent records."

[4] In addition, there is a required thirty-foot minimum side yard between the development and adjacent properties.

167-12(A)(7)(c), however, requires "adequate space" in front of each building, for fire apparatus to approach.

To summarize, by definition "a multifamily development" must be three or more units; on a "single lot of land" of at least ten acres and described in a recorded deed or recorded plan; the number of units may not exceed the number of acres of the parcel; and there must be one hundred feet between buildings.

To complicate matters, the term "multifamily development complex" is introduced for the first time in § 167-7(D)(2)(a), which the judge and parties refer to as "[s]ubsection (a)." Subsection (a) provides that "any multifamily development complex proposed hereunder shall locate each building on an individual lot which shall have continuous frontage on a public or private way." The term "complex" is not defined in the bylaw and the few references in the bylaw to a "multifamily development complex" shed little light on its definition.

2. Procedural history. The procedural history is undisputed. The proposed project first received site plan approval from the town's planning board on September 18, 2014, and a special permit from the board in 2015, neither of which was appealed. Although the original plans showed one large lot and six duplex-buildings, at the request of the planning board,

4

the site plan was amended to show, with solid lines, each building on an individual lot (Lots A-F). However, there exists no recorded plan showing those lots. The board issued a special permit pursuant to a revised site plan that moved the sidewalk along Amanda's Way away from the Andrews property, but still showed Lots A-F.

After considerable site work including construction of Amanda's Way had been accomplished in reliance on the site plan approval and special permit, the building inspector granted four building permits for two duplexes in May 2017. The plaintiff, abutter Gordon C. Andrews, appealed to the board from the grant of the building permits, arguing that Lots A-F were not legal lots because they were not shown on a plan recorded in the registry of deeds and that the lot had to be formally subdivided. Andrews also requested that the building inspector enforce the zoning bylaw which, he asserted, required legal lots. The building inspector upheld the building permits and denied Andrews's enforcement request, and the board affirmed both decisions. Thereafter, Andrews commenced an action in the Land Court against the board and the building inspector, seeking review of those decisions (action 17 MISC 000507). The developer was allowed to intervene. Without waiting for the

5

results of that appeal, the developer proceeded to construct four units (two duplexes).

The judge remanded to the board for consideration of two issues, (1) whether the 2014 site plan and 2015 special permit required the developer to locate each proposed building on a "separate lot" and (2) whether the project meets the bylaw's definition of a "multifamily development." The board's decision after remand concluded that the proposed project meets the definition of a "multifamily development;" that neither the bylaw, the site plan approval, nor the special permit require that the property be formally subdivided into individual lots; and that the individual-lot requirement contained in the bylaw is only to demonstrate that the project does not exceed the number of dwellings allowed.

Proceedings continued in the Land Court after the board reached its decision on remand, and on cross motions for summary judgment, the judge granted partial summary judgment to the developer on the narrow issue whether the provisions of § 167-10(B) of the bylaw -- specifically the general frontage requirement for the AR district -- apply to the proposed project. The judge concluded that the specific provisions of § 167-12(A) replace the general provisions of § 167-10(B). Summary judgment was denied on the remaining issues and trial

6

proceeded on two issues: (1) whether the 2014 site plan approval required subdivision of the site prior to issuing building permits; and (2) whether the special permit required such subdivision. After trial, the judge answered the first question in the affirmative and entered a judgment, dated December 16, 2019, ordering that the building permits be revoked. The judge did not decide the issue whether the bylaw requires formal subdivision to create individual lots. Both parties appealed -- Andrews from so much of the judgment that concluded the general frontage requirements for the AR district do not apply.

In 2019, the developer applied to the planning board and then the board for modifications of the site plan and special permit. Those modifications reconfigured the lots, placing each constructed duplex on a "lot" (lots 1 and 3) and placing two duplexes connected by a breezeway on each of two other lots (lots 2 and 4). The site plan bore a note stating that "All lot designations and lot lines shown on plans are for dimensional purposes only." The planning board approved the modified site plan, and the board approved the special permit based on the modified site plan. Andrews filed a second action in the Superior Court appealing from the board's modification of the special permit (action 2083CV000256), and the same Land Court

judge was designated as a justice of the Superior Court for purposes of deciding it.

On March 16, 2020, the building inspector issued four modified building permits for each of the constructed units, and a certificate of occupancy for one of the units ("the 2020 permits"). Andrews commenced a third action on September 11, 2020, appealing in count one from the board's denial of his challenge to the 2020 permits and in count two challenging the denial of Andrews's enforcement request (action 20 MISC 000372). Andrews's complaint also sought a declaratory judgment that subsection (a) applies to the project. Expressly seeking to interpret the bylaw "to give effect 'to all its provisions, so that no part will be inoperative or superfluous,'" Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 477 (2012), quoting Connors v. Annino, 460 Mass. 790, 796 (2011), the judge concluded that a "'multifamily development complex' under the By-Law is a subset of multifamily developments" and that a "complex" is a multifamily development comprised of two or more buildings. The judge used the dictionary term for "complex," which is "[c]onsisting of interconnected or interwoven parts; composite; compound," and concluded that the term "complex" distinguished between single-building multifamily developments and those comprised of two or

8

more buildings.  The judge concluded that if the multifamily development is sited within one building, it can ignore subsection (a); if the development encompasses multiple buildings, the developer must comply with subsection (a).  Once again, the Land Court vacated the permits, by two judgments dated August 23, 2022.  The developer appealed, and the three appeals were consolidated in this court for briefing and decision.

Discussion.  1.  Timeliness.  The developer first argues that because Andrews did not appeal from the 2015 special permit and the 2014 site plan approval, his challenge to the 2017 building permits were in fact a belated attempt to appeal from the approval of the site plan and special permit.  In the circumstances of this case, where Andrews reasonably could have interpreted the 2015 special permit and 2014 site plan as requiring subdivision of Lots A-F, we discern no impediment to Andrews's challenge of the building permits, issued without subdivision approval -- Andrews was in effect seeking enforcement of the 2015 special permit.[5]

2.  Application of subsection (a).  "[B]ecause the Land Court judge decided [this issue] on cross motions for summary

_____

[5] We need not reach the issue whether a failure to appeal from a special permit and site plan makes a challenge to a subsequent building permit untimely.

9

judgment, we give no deference to [his] decision" (citation omitted).  Pinecroft Dev., Inc. v. Zoning Bd. of Appeals of W. Boylston, 101 Mass. App. Ct. 122, 128 (2022).  "We review interpretations of zoning bylaws de novo and according to traditional rules of statutory construction."  Id.  Where "terms are undefined or otherwise ambiguous, we will defer to a local zoning board's reasonable interpretation" unless "it is inconsistent with that provision's purpose or the bylaw as a whole."  Id.  "[A] judge must review with deference legal conclusions within the authority of the board," at least in part because of the board's "special knowledge of 'the history and purpose of its town's zoning by-law'" (citation omitted).  Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 381 (2009).  "[T]he decision of a board 'cannot be disturbed unless it is based on a legally untenable ground' or is based on an 'unreasonable, whimsical, capricious or arbitrary' exercise of its judgment in applying land use regulation to the facts as found by the judge" (citation omitted).  Id.

The judge found that subsection (a) "means what it says: each building in a multifamily development complex must be on an 'individual lot which shall have continuous frontage on a public or private way,'" and that the project does not comply with that

10

requirement, as there is no recorded plan that shows each of the development's existing and proposed duplexes on an individual legal lot. The board's view, in its decision, was that the individual-lot requirement is simply to show the density and not a requirement that formal subdivision is necessary. Thus, on appeal, the developer focuses on the requirements of subsection (a) and whether it must obtain subdivision approval and record a subdivision plan showing individual lots for each building.

We focus, instead, on whether subsection (a) even applies to the proposed project. We examine the definition of "multifamily development" as compared to "multifamily development complex" as those terms are used in the bylaw. We do so because the "lot" requirements for "multifamily developments" as they are specifically defined in the bylaw and the "lot" requirements for a multifamily development "complex" are different. By definition, a multifamily development consists of three or more dwelling units "on a single lot of land under one (1) ownership of not less than ten (10) acres in size" (emphasis added). Subsection (a), applicable to a multifamily development "complex," requires each building to be placed on an individual lot with frontage on a public or private way. As the judge concluded, reasonably read, a "multifamily development" and a "multifamily development complex" are

11

different in some meaningful way and subsection (a) applies only to "multifamily development complex[es]." This is true because if both the definition of multifamily development (requiring a ten-acre lot minimum) and the individual-lot requirement for each building contained in subsection (a) applicable to multifamily development complexes are read together, each building would have to be placed on an individual ten-acre lot and each building would have to have three or more units. We agree with the board that the town could not have intended such an absurd result. If the individual-lot requirement were applied, the 2014-2015 plans would not even show a "multifamily development" because the individual lots would not contain three or more units.

Quite simply, the town failed to define "complex." It is true that the meaning of words used but not defined in a bylaw are "construed in accordance with common understanding and usage." Lussier v. Zoning Bd. of Appeals of Peabody, 447 Mass. 531, 534 (2006), quoting Davis v. Zoning Bd. of Chatham, 52 Mass. App. Ct. 349, 361 n.16 (2001). We depart from the judge's interpretation, however, because common usage of "development" and "complex" both encompass the potential for more than one building. Here, that the "multifamily development" regulations clearly envisioned the possibility of multiple buildings is

12

evident by the requirement of one hundred feet between buildings, and that there be "adequate space in front of each building for fire apparatus to approach the buildings."  Thus, we cannot conclude that a multifamily development complex simply means a multifamily development with more than one building.

The record is barren of any evidence of the town's intent in using the term "complex."  It may have intended to distinguish multifamily developments of a specific size, or which include a variety of structures including pools, a club house, or function facilities, or even multifamily developments that could not meet the ten-acre minimum or proposed less-than-three dwelling units.  However, the modified development meets all of the criteria for a "multifamily development" in terms of lot size and density -- it is twelve acres and it proposes twelve units.[6]  We conclude that where the ordinance clearly defines "multifamily development(s)" and the proposed project fits the definition, and "complex" is undefined and there has been no concrete reason given to compel the conclusion that the proposed plans shows a "complex" as that term is used in the bylaw, the board reasonably granted the modified 2020 special

---

[6] The 2019 site plan that was approved by the 2020 special permit shows two duplexes connected by a breezeway.  The Land Court judge noted that the parties did not brief whether the connected duplexes constitute a single building.  Where it was not briefed below or on appeal, we consider the issue waived.

13

permit and the building inspector reasonably granted the associated building permits and certificate of occupancy. The bylaw does not require that each building of a "multifamily development" be shown on an individual lot with frontage on a public or private way.

We are aware that the board's interpretation of the multifamily provisions of the bylaw has varied, and that at least initially, the board and the planning board required that individual lots be shown for each building for the project at issue. Town counsel also concluded that the individual-lot requirement applies to this project. We conclude, however, that any inconsistency in the interpretation of the bylaw stems from the town's failure to define "complex" while adopting seemingly conflicting lot size requirements.[7]

3. <u>Frontage requirement</u>. The board and the judge concluded that the bylaw provisions regulating multifamily developments do not contain a frontage requirement. Andrews argues that the judge erred in not applying the general frontage requirement applicable in the AR district, which is 150 feet of continuous frontage. Where the bylaw provides general density regulations and then specific density regulations for a

---

[7] Andrews suggests that the board has treated similarly situated applicants differently but makes no specific claim based on disparate treatment.

14

multifamily development that includes no frontage requirement, we cannot say the judge erred in applying the more specific provision.  See Doe v. Attorney Gen. (No. 1), 425 Mass. 210, 215 (1997).  Moreover, the conclusion that there is no frontage requirement is supported the provision requiring adequate frontage for fire trucks, which would be unnecessary if the 150-foot frontage requirement applied to multifamily dwellings.  We discern no error in the board's reasonable interpretation of its bylaw.

Conclusion.  We agree with the judge that the 2014 site plan, showing what purported to be legal individual lots, and 2015 special permit based on that site plan, contemplated formal subdivision of the lot to create Lots A-F.  Thus, in action 17 MISC 000507, the judgment dated December 16, 2019, is affirmed.  As for the modified plan at issue in actions 2083CV000256 and 20 MISC 000372, we vacate the judgments dated August 23, 2022, in which the judge concluded that the bylaw requires each building to be on a subdivided lot and revoking the building permits, certificate of occupancy, and site plan and special permit decisions; and we remand those cases for entry of orders reinstating the 2020 permits and certificate of occupancy.  A declaration shall enter that where a proposal meets the bylaw's definition of a "multifamily development," the single-lot

15

requirement for multifamily development complexes does not apply.  We remand actions 2083CV000256 and 20 MISC 000372 to the Land Court for the entry of orders consistent with this decision.[8]

So ordered.

By the Court (Meade, Blake &
Neyman, JJ.[9]),

*Paul Little*

Clerk

Entered:  August 1, 2024.

---

[8] Both Andrews's and the developer's request for costs and other relief are denied.

[9] The panelists are listed in order of seniority.