GPH Cohasset, LLC, & another[1] vs. Trustees of
Reservations & others.[2]

No. 13-P-1304.

Suffolk. April 2, 2014. - June 25, 2014.

Present: Grainger, Rubin, & Hanlon, JJ.

*Zoning,* Special permit, Conditions, By-law. *Real Property,* Conservation restriction. *Environment,* Noise. *Evidence,* Disclosure of evidence, Expert opinion. *Witness,* Expert. *Practice, Civil,* Discovery.

In a civil action brought in the Land Court, the judge correctly upheld the decision of the defendant municipal planning board (board) granting a special permit to erect a wind turbine on property located within two reservations owned by the defendant trustees, where the conditions of the board's approval constituted sufficient findings to support its decision [558-559]; where the board's decision conditioned approval on a noise impact study to be conducted after the erection of the wind turbine [559] and on the requirement that the wind turbine be shut down if its stroboscopic "shadow flicker" impact exceeded a daily or yearly threshold level [559-560]; where the record amply supported the judge's findings that the locus was not burdened by municipal restrictions and that a strategic plan had been adopted to reduce the trustees' carbon footprint [560]; and where the board did not act arbitrarily regarding safety and adequately addressed the plaintiffs' safety concerns by imposing extensive conditions for approval and ongoing operation [560-561].

At the trial of a civil action, the judge did not abuse his discretion in excluding the testimony of the plaintiffs' expert witnesses, where, given that the plaintiffs disclosed the witnesses well after the close of discovery, the judge properly could have determined that the late disclosure would have prejudiced the defendants or caused delay of the trial. [561-562]

In the discovery proceedings of a civil action, the judge did not err in denying the plaintiffs' motion to compel the production by a third party of a document. [562]

---

[1]GGNSC Cohasset, LLC.

[2]Conservation Wind Partners, LP, and the planning board of Cohasset. For reasons that are not explained in the record, Conservation Wind LP never was formed as a legal entity. Instead, Conservation Wind Partners, LP, was formed as a for-profit limited partnership to serve as the applicant for the purpose of taking advantage of tax-incentive financing to construct the wind turbine. The planning board of Cohasset amended its decision on May 5, 2011, to substitute Conservation Wind Partners, LP, for Conservation Wind, LP, as the applicant. A motion to substitute a party was allowed below.

CIVIL ACTION commenced in the Land Court Department on March 25, 2011.

The case was heard by *Alexander H. Sands, III,* J.

*Damon M. Seligson* for the plaintiffs.

*Michael K. Murray* for Trustees of Reservations & another.

*Kimberly M. Saillant* for planning board of Cohasset.

GRAINGER, J. The plaintiffs, GPH Cohasset, LLC, and GGNSC Cohasset, LLC (collectively, Golden Living), appeal from a judgment of the Land Court affirming a decision of the defendant planning board of Cohasset (board) to grant defendant Conservation Wind Partners, LP (Conservation Wind), a special permit to erect a wind turbine on property owned by defendant Trustees of Reservation (trustees). On appeal, Golden Living asserts that (1) the trustees and Conservation Wind did not satisfy their burden of proof to obtain approval of the special permit and site plan, (2) the wind turbine creates public safety concerns, (3) the judge erred by precluding Golden Living's expert witnesses from testifying, and (4) the judge erred by declining to compel the production of the wind turbine's operating manual.

*Background.* We recite the facts as found by the judge following a bench trial, reserving certain details for our discussion of specific issues. On October 28, 2010, Conservation Wind filed an application for a special permit and site plan approval to erect a wind turbine on certain property (locus) owned by the trustees.[3] The locus consists of two large parcels of land, which together comprise approximately 314 acres within two adjacent reservations known as Whitney and Thayer Woods (WTW) and Turkey Hill Reservation (Turkey Hill).[4] The towns of Cohasset

---

[3]The trustees exist as an organization pursuant to c. 352, § 1, of the Acts of 1891 "for the purpose of acquiring . . . and opening to the public . . . beautiful and historical places and tracts of land within this Commonwealth." In 2007, the trustees adopted a strategic plan that included the goal of reducing the organization's carbon footprint to zero. In 2008, the trustees amended their articles of organization to include new powers such as the power to "sell, convey, lease, exchange, transfer or otherwise dispose of . . . any of its property." G. L. c. 156B, § 9, inserted by St. 1964, c. 723, § 1.

[4]Three hundred and eight acres of the locus are located within WTW, while another 6.6 acres are the Nike Parcel (a portion of which formerly was a United States Army missile and radar development site). The Nike Parcel is owned by the trustees but is located within Turkey Hill.

and Hingham (collectively, towns) own much of the land sur-
rounding the locus, which, along with the locus, is open to the
public for recreational use.

The towns granted conservation restrictions to the trustees,
limiting the use of the town-owned land in Turkey Hill (the
municipal restrictions). The municipal restrictions each contain
several prohibited uses, including the construction of any
permanent structure, cutting or removing trees, and any surface
use other than agricultural, farming, forest, or recreational uses.
The municipal restrictions also each contain an appendix A
identifying the land burdened by the restrictions. The locus is
not included or described in either town's appendix A. The
trustees' expert, Nancy Harris, testified that the municipal restric-
tions do not burden any part of the locus.

In addition to appendix A, a land use and management plan
(land use plan) was appended to each of the municipal restric-
tions as exhibit B. Harris testified that the terms of the land use
plans do not restrict any part of the locus.

Before applying for site plan approval and a special permit,
the trustees engaged a consulting firm to conduct a feasibility
study to evaluate, among other things, the environmental impact
of the wind turbine. A sound study conducted in coordination
with the feasibility study found that the Vestas 90 model turbine
would produce a noise level increase of no more than six decibels
(expressed as dBA) above the current ambient noise level at the
closest neighboring property (the Golden Living property, a
nursing home).[5] Noise level increases at all other neighboring
locations were less than six dBA above ambient. The Depart-
ment of Environmental Protection's (DEP) noise policy provides
that emissions of more than ten dBA above ambient will violate
the provisions of 310 Mass. Regs. § 7.10 (2001), the DEP's
noise regulation.

The feasibility study also evaluated the stroboscopic "shadow
flicker" impact at various adjacent locations. The study found
that the Vestas 90 model turbine, and a more distant siting,[6]

---

[5]The first sound study found that ambient noise levels would be increased
by eight dBA, but those measurements were based on use of the Vestas 100
model turbine. The trustees later decided to use the Vestas 90 model turbine
and had the study's findings amended.

[6]The study first was conducted assuming the Vestas 100 model turbine

would result in a maximum shadow flicker of fifty-five hours per year at the nearest residential property (the Golden Living property). This calculation was a maximum figure that did not take into account certain corrective factors (such as cloud cover). The shadow flicker impact at all other neighboring locations was estimated to be less than fifty-five hours per year. There are no Federal, State, or local regulations governing the maximum permissible shadow flicker impact on nearby property. However, generally accepted practice within the industrial wind turbine industry subjects an abutting owner or structure to no more than thirty hours per year of shadow flicker.

On March 10, 2011, the board issued a decision approving Conservation Wind's application for a special permit and site plan approval to erect the wind turbine, subject to thirty-seven conditions. On March 25, 2011, Golden Living filed a complaint in the Land Court appealing the board's decision. After a four-day bench trial, including a site view, a judge of the Land Court issued a forty-four page decision upholding the board's approval. Golden Living filed this timely appeal.

*Discussion.* Golden Living asserts a litany of reasons why Conservation Wind failed to satisfy its burden for approval of the special permit; we address them seriatim. "On appellate review, the judge's findings of fact will not be set aside unless they are 'clearly erroneous' or there is 'no evidence to support them.' " *Wendy's Old Fashioned Hamburgers of N.Y., Inc.* v. *Board of Appeal of Billerica*, 454 Mass. 374, 383 (2009), quoting from *DiGiovanni* v. *Board of Appeals of Rockport*, 19 Mass. App. Ct. 339, 343 (1985).

1. *Zoning.* Golden Living asserts that the board's decision cannot stand because it failed to make sufficient factual findings that demonstrate the project complies with the zoning by-law. Section 12.4(1)(b) of the Cohasset zoning by-law requires that the board make "written findings certifying compliance" with the by-law before granting a special permit. The judge found that "instead of making specific findings, the Board conditioned its approval on the Trustees complying with numerous condi-

would be used and it found a maximum shadow flicker as high as ninety-nine hours per year at the Golden Living property. Changes were made in the siting configuration following this finding before the updated figures were calculated using the Vestas 90 model turbine.

tions to ensure compliance with the Bylaw." We have held that detailed conditions of approval "do double duty as findings." *Tebo* v. *Board of Appeals of Shrewsbury*, 22 Mass. App. Ct. 618, 621 (1986). Moreover, we agree with the judge that the "board avoided the common vice of parroting the statutory standards for a grant of a special permit in lieu of findings." *Id.* at 622. In sum, we agree with the judge's determination that the board made sufficient findings to support its approval.

2. *Noise.* Golden Living asserts that Conservation Wind failed to establish that the wind turbine would comply with applicable noise regulations. Specifically, Golden Living criticizes Conservation Wind's experts' two sound studies, asserts that each used a different wind speed, and argues that both failed to account for changes in ambient noise levels throughout the year. The judge found that Golden Living's claims were meritless because the sound studies were not based on different wind speeds, and determined that ambient noise levels would not exceed the allowed ten dBA threshold at any time of the year. The judge also noted that the board's decision conditions approval on the conduct of a noise impact study after the wind turbine is erected, and requires the wind turbine to be shut down if the impact exceeds ten dBA. We agree with the judge that this condition was sufficient to address any noise concerns and to ensure compliance with the ten dBA threshold.

3. *Shadow flicker.* Golden Living asserts that Conservation Wind failed to show that the wind turbine would not result in excessive shadow flicker. As stated *supra*, while there are no Federal, State, or local regulations governing maximum acceptable levels of shadow flicker, the generally accepted industry practice limits shadow flicker to no more than thirty hours per year. The feasibility study found that, assuming one hundred percent clear skies and no shadows from trees or structures, the Vestas 90 model turbine would create a maximum of fifty-five hours of shadow flicker per year at the Golden Living property. The judge found that the Golden Living property is surrounded by large trees and that the fifty-five-hour calculation represented a maximum and conservative figure. Moreover, and similar to the noise concern, the board conditioned approval of the special permit on the requirement that the wind turbine be shut down if

actual shadow flicker impact exceeds thirty minutes per day or thirty hours per year (condition 10).

4. *Site control.* Golden Living claims that the trustees cannot demonstrate proper site control over the locus. In particular, Golden Living asserts that the trustees' legislative mandate does not permit the locus to be the site of a for-profit wind energy plant because the municipal restrictions expressly prohibit such use. As stated *supra,* the municipal restrictions each contain an appendix A that specifically describes the burdened land. The judge both examined appendix A and credited the testimony of the trustees' expert, Harris, that the locus was not burdened by the municipal restrictions.[7] On this record we discern no error. In addition, and contrary to the assertion that the locus was intended to be restricted in the manner described by Golden Living, the judge determined that a 2008 amendment to the trustees' articles of organization allowed the acquisition and ownership "in land . . . and structures as [they deem] appropriate and in the public interest." In that context the trustees also adopted a strategic plan that stated the goal of reducing the trustees' carbon footprint. See note 3, *supra.* There is ample support for these findings in the record.[8]

5. *Public safety.* Golden Living asserts that the wind turbine presents safety concerns (ice throw, blade throw, turbine collapse, and fire) that were not addressed by the board.

The judge found that the board's conditions of approval adequately addressed Golden Living's safety concerns.[9] We

---

[7]This issue combines law and fact. While the legal import of appendix A is independently reviewable on appeal, the actual location and boundaries of the relevant area is a factual determination.

[8]We also note that Golden Living's argument here concerning site control spans barely one paragraph and contains no citations to legal authority. As such it fails to rise to the level of appellate argument pursuant to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Cameron* v. *Carelli,* 39 Mass. App. Ct. 81, 85-86 (1995).

[9]Condition 18 requires that the wind turbine include an automatic fire suppression system, while condition 4 requires Conservation Wind to provide training and equipment to the local fire and police departments. Condition 12 requires the installation of a system to detect ice accumulation and to shut down the wind turbine automatically if ice is detected. Condition 11 requires the installation of a winter barrier as well as permanent signs at a distance of 410 feet from the base of the wind turbine to alert the public to the possibility of ice throw.

concur. The wind turbine will be set back more than 400 feet in each direction from the nearest property line. Golden Living does not dispute that the setback meets the minimum setback requirement in the zoning by-law. Golden Living puts forth no evidence to show that the wind turbine was susceptible to blade throw or turbine collapse. The record indicates that the board did not act arbitrarily with regard to safety and that it adequately addressed Golden Living's concerns by imposing extensive conditions for approval and ongoing operation.

6. *Exclusion of expert witnesses.* During discovery, Golden Living did not identify any experts in their interrogatory answers, representing instead that they would supplement their answers. Discovery closed on January 13, 2012; as of that date, Golden Living had failed to supplement the interrogatory answers. In the joint pretrial memorandum, filed April 23, 2012, Golden Living identified, for the first time, two experts they expected to testify at trial. Although the experts were disclosed four months prior to trial, Golden Living concedes that the disclosure was made well after the close of discovery. The judge granted Conservation Wind's and the trustees' motion in limine to exclude Golden Living's experts. Golden Living asserts that the judge abused his discretion in precluding its expert witnesses' testimony.

"Trial judges have 'broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. . . . Within this discretion lies the power to exclude or deny expert testimony.' " *Mattoon* v. *Pittsfield,* 56 Mass. App. Ct. 124, 131 (2002), quoting from *Nally* v. *Volkswagen of America, Inc.,* 405 Mass. 191, 197 (1989).

We conclude that the judge did not abuse his discretion in excluding Golden Living's experts. The judge was entitled to determine that allowing the experts to testify after Golden Living's late disclosure would have prejudiced the defendants or caused delay of the trial. See *Kearns* v. *Ellis,* 18 Mass. App. Ct. 923, 924 (1984) ("Under Mass.R.Civ.P. 26[e][1][B], 365 Mass. 776 [1974], a 'party is under a duty seasonably to supplement his response with respect to . . . the identity of each person expected to be called as an expert witness' "). We cannot say that excluding the experts was an abuse of discretion in

these circumstances. See *Shaw* v. *Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 713 (1985).

7. *Vestas operating manual.* Golden Living complains that the judge erred in refusing to compel Vestas, a nonparty, to produce the operating manual for the Vestas 90 model turbine. We review a trial judge's decision to deny ordering the production of documents for abuse of discretion. *Bishop* v. *Klein*, 380 Mass. 285, 288 (1980). We discern no such abuse here.

Golden Living has neither challenged the validity of the by-law setback requirement nor suggested that the wind turbine fails to comply with the by-law. Instead, Golden Living merely speculates that the operating manual contains a larger setback requirement than the by-law. The board was charged with determining whether the proposed wind turbine satisfied the by-law, not the manufacturer's operating guidelines. The judge did not err in denying Golden Living's motion to compel the production of the operating manual.

*Judgment affirmed.*