NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-345                                        Appeals Court

JONATHAN FISH[1] & another[2] vs.  ACCIDENTAL
AUTO BODY, INC., & others.[3]

No. 18-P-345.

Barnstable.     November 7, 2018. - May 24, 2019.

Present:  Agnes, Blake, & Neyman, JJ.

Zoning, Special permit, Automobile repair shop, Timeliness of
    appeal, By-law.  Practice, Civil, Zoning appeal, Burden of
    proof.  Environment, Air pollution.

Civil action commenced in the Superior Court Department on
December 8, 2014.

The case was heard by Gary A. Nickerson, J., and a motion
to amend judgment was considered by him.

Christopher G. Senie for the plaintiffs.
Shannon Dunn Resnick for the Accidental Auto Body, Inc., &
another.

---

[1] In conformity with our practice, we spell the parties'
names according to how they are spelled in the operative
complaint.

[2] Susan Fish.

[3] Robert A. Lawton and zoning board of appeals of Mashpee.

AGNES, J.  On November 20, 2014, the zoning board of appeals of Mashpee (board) granted the application of Accidental Auto Body, Inc. (Auto Body), for a special permit allowing it to construct an auto body shop on property located in the economic development and industrial corporation area of the town of Mashpee's (town's) industrial zoning district.  The plaintiffs, residential abutters of the locus who claimed harm from potential air pollution and noise impacts,[4] appealed to the Superior Court pursuant to G. L. c. 40A, § 17, in an effort to overturn the decision.  Following a trial, a judge affirmed the board's decision.  The plaintiffs now appeal from the judgment, asserting that Auto Body did not meet its burden under the town's bylaw (bylaw) to prove that the plaintiffs would not be harmed by chemicals released into the air.  For the reasons that follow, we conclude that the board and the judge erred in determining that Auto Body complied with § 174-24(C)(2) of the bylaw, which imposes on the party seeking a special permit the burden to establish that "the proposed use . . . will not adversely affect public health or safety . . . [and] will not significantly decrease . . . air quality."  Accordingly, we vacate the judgment.[5]

---

[4] The plaintiffs do not pursue on appeal any issues pertaining to noise impacts.

[5] Nothing in this opinion should be understood as a retreat

Background.  We draw the facts from the judge's findings and undisputed testimony, noting where the plaintiffs contend they are clearly erroneous.  Auto Body proposed to build a 9,000 square foot building approximately seventy-four feet away from the plaintiffs' northern boundary line.[6]  Auto Body's work will include painting of repaired vehicles, generally requiring two layers of top coat which contain isocyanates.  Isocyanates are a "useful" but "harmful" molecule.  In contrast to the water-based preliminary coats of paint, which cannot withstand moisture, water, and sunlight, the carbon-based isocyanates in the top coats create bonds that are almost indestructible and ensure a durable finish.

The top coats and base coats will be applied by spray in a paint booth, "a fully enclosed structure within the auto body shop building."  The judge found, as the plaintiffs' expert conceded, that Auto Body proposes to use the best available

---

from the traditional deference courts show to the legal conclusions reached by local zoning boards acting within the scope of their authority, and the respect for judicial findings of fact when supported by evidence in the record.  However, this is a case in which the judge's findings of fact acknowledged a health and safety risk as a result of the grant of the special permit.  In such a case, local and State law impose on the applicant, not those in opposition to the special permit, the burden of establishing that the proposed use will not adversely affect public health or safety.

[6] The judge did not make a finding regarding the distance, but Auto Body's civil engineer testified that the distance is seventy-four feet and the board made that same finding.

filter system and to locate the vent as far away from the plaintiffs' properties as possible.[7]  Nonetheless, the judge found that two percent of the isocyanates will escape with the exhaust.  He also found that although isocyanates are unstable, they are rendered harmless within minutes after they become airborne.  These findings of fact are consistent with the testimony of one of the plaintiffs' expert witnesses, Dr. William Sawyer, a professional toxicologist.[8,9]  The judge did

---

[7] Although the judge found that "[t]he predominant winds are from the southwest, tending to move any exhaust away from" the plaintiffs' property, the plaintiffs correctly note in their reply brief that there is no evidence in the transcript or the exhibits that supports this finding.

[8] Sawyer holds a doctorate degree in toxicology from Indiana University School of Medicine.  He is a diplomate of the American Board of Forensic Medicine with approximately twenty-seven years of experience in public health and forensic toxicology.

[9] Sawyer testified that "an isocyanate . . . is an extremely toxic chemical."  He added, "[H]uman toxicological studies are extremely clear. . . .  [I]socyanates induce several disease processes when inhaled, even for a brief period of time of 15 minutes . . . [and] at levels as low as one part per billion."  Sawyer also testified that "[t]he monomer is a molecular single molecule of isocyanate; for example, a single molecule of hexamethylene diisocyanate.  And they cannot be captured by the filter because they are vapory.  It's like humidity in air; it goes right through the filter.  The filter does not contain carbon.  It does not contain piperazine liquid, which is what is used to capture isocyanates when you run a laboratory test.  You have to bubble the air through piperazine liquid to capture it.  That's not what's used.

"These are simply not much different than a furnace filter.  And the vapors, they have monomers, will go completely past it, without capture.  Unfortunately the monomers are the most toxic

not credit the testimony of the plaintiffs' expert that it would not take five minutes for the isocyanates to reach the plaintiffs' property, or that the isocyanates very likely would present health risks. Auto Body offered no testimony, expert or otherwise, on the issue whether isocyanates would reach the plaintiffs' property and, if so, whether the isocyanates would be rendered harmless before they reach the plaintiffs' property.

The judge noted that the plaintiffs' expert, "a well credentialed toxicologist familiar with the dangers posed by isocyanates, . . . shed little light on the pertinent question as to what harmful effects the plaintiffs might suffer." The judge determined that, although "Sawyer stated that anyone directly breathing the fumes coming out of a painting booth during the application of a top coat may be harmed unless wearing a respirator[, he] offered little credible insight as to

---

form of isocyanates because the monomers are inhaled into the deep lung . . . and do their damage. And unfortunately, these filters have no capacity whatsoever to capture monomers. And that's basically the science between the filters."

Sawyer opined that although the filters will trap ninety-eight percent of the particulate, no filter can filter out the monomers, the most dangerous isocyanates; that even with best practices, siting is important; and that the paint booth simply should not be close to schools or residences without a risk assessment having been performed. Using what he described as Environmental Protection Agency standards, Sawyer opined that during the spray process, about 11,000 cubic feet of air is discharged from the exhaust system per minute and that each cubic meter of such exhaust would contain six hundred parts per billion of isocyanates.

how such fumes disperse and travel once ejected into the open atmosphere; that being outside his area of expertise."[10]

The judge took judicial notice of State and Federal regulations, see infra, and noted that "[t]he potential harmful effect of auto body paint fumes is well known and thus the industry must meet [F]ederal [Environmental Protection Agency

---

[10] Sawyer testified that studies are extremely clear; isocyanates induce several disease processes when inhaled even for a brief period of fifteen minutes, including reactive airway dysfunction syndrome, occupational asthma, exacerbation of underlying asthma, and other pulmonary diseases. Persons of all ages who suffer from asthma and children are particularly vulnerable to the toxicity of isocyanates. While Sawyer stressed the need for a health risk assessment, he did opine that isocyanate exposure presents a "clear health threat" to persons playing or gardening within an area close enough that the chemical has not degraded. He stated: "I can say this: that because there's such a huge concentration gradient, and the air, actually, going out, . . . has enough fluid, it actually exceeds occupational health standards. And being in such short proximity, that will not be a sufficient distance for the airborne monomers, the isocyanate monomers to degrade, . . . point A to B, in this case, it's going to occur very quickly. It's not going to take five minutes for that air to impact the receptor." Even if only five percent of the painting performed has isocyanates, Sawyer testified that "[d]uring that five percent window, that's going to be more than 15 minutes of work . . . there's going to be periods in which high levels of isocyanates are coming out. And if you happen to be impacted at that time for 15 minutes, there's going to be some health effects." Sawyer further testified that what actually comes out of the vent will contain isocyanate "about 30,000 times" above the Massachusetts ambient air level guideline. In addition, Sawyer testified that in this case, "where emissions are discharged at such a huge level above [the ambient air level guidelines], . . . I would be amazed if a health risk assessment found no risk. I very, very much doubt that would be the case."

(EPA)] and [S]tate [Department of Environmental Protection (DEP)] standards."  The judge asked the plaintiffs' expert whether State and Federal regulations are sufficient to protect the plaintiffs.  The expert responded that they were not.  He stated, "No.  And neither is that [true] in EPA's opinion.  If you actually look at the automotive finishing industry toxicology profile, the problem they point out is that the isocyanates . . . are not captured in the filter.  The monomers . . . go through.  And . . . that's the problem."

   In concluding that the special permit was properly granted, the judge reasoned that (1) isocyanates, though dangerous, are widely used in industry "without detriment to health and safety so long as appropriate precautions incorporated in the [Federal and State] regulations are followed," (2) "[t]here are no EPA or DEP regulations as to the required distance between a paint booth exhaust pipe and residential structures," (3) Auto Body's "Hyannis facility is in a mixed use area with homes adjacent to the facility and no history of harmful effects despite [Auto Body's] use at that site of both topcoat and undercoat paints containing isocyanates," (4) in this case the fumes would be vented from a location "from the north end of the shop, further away from the [plaintiffs'] homes," and (5) neither Federal nor State environmental regulations require an air modeling study, as recommended by Sawyer, before permitting an auto body

painting facility, and it is "prudent to rely on the regulatory process governing auto repair shops (both EPA and DEP)[11] to ensure [Auto Body's] shop will not significantly decrease air quality and thus will not adversely [affect] public health. This court hastens to add that [Auto Body's] embrace of the industry's best practices further supports this conclusion." The judge added that the "plaintiffs purchased homes adjacent to an active, growing industrial area" and "[s]ignificant adverse impact must be seen through that lens, which compels the answer that there is none."

Discussion. 1. Timeliness of the appeal. As an initial matter, Auto Body contends that the plaintiffs' appeal is untimely. Judgment entered on December 13, 2017. Within ten days, on December 20, 2017, the plaintiffs filed a notice of intent to file a motion to alter the judgment. See Rule 9E of the Rules of the Superior Court (2004). Thereafter, the plaintiffs filed a motion to amend the judgment, together with an affidavit of no opposition, on January 5, 2018. Auto Body does not contend that the motion to amend was not served within ten days, as required by Mass. R. A. P. 4 (a), as appearing in 481 Mass. 1606 (2019). The motion is not contained in the

---

[11] The judge took judicial notice of 310 Code Mass. Regs. § 7.03(16) (2011), 310 Code Mass. Regs. § 7.12 (2001), and 40 C.F.R. §§ 63.11169 et seq. (2014).

record appendix, and thus we cannot ascertain the basis or bases of the motion and the exact rule under which the plaintiffs proceeded.  The result of the motion, however, was that the judgment was amended to remove the award of costs.  A corrected judgment entered on January 11, 2018.  On February 6, 2018, the plaintiffs filed their notice of appeal.

Without citation to authority, Auto Body contends that because the motion to amend did not pertain to the issues the plaintiffs pursue on appeal, they should have filed a notice of appeal within thirty days of the original December 13, 2017 judgment.  Nothing in rule 4 (a) requires piecemeal notices of appeal.  Rather, rule 4 (a) expressly provides that when a timely motion to alter or to amend a judgment under Mass. R. Civ. P. 59, 365 Mass. 827 (1974), or Mass. R. Civ. P. 60, 365 Mass. 828 (1974), is served within ten days after entry of judgment, a notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion.  Indeed, any previously filed notice of appeal is without effect.  We conclude, therefore, that the plaintiffs' notice of appeal was timely.  Contrast Franchi Mgt. Co. v. Flaherty, 93 Mass. App. Ct. 418, 422-424 (2018) (sua sponte correction of clerical error does not restart thirty-day time period to file notice of appeal; nor did party's subsequent motion to correct additional clerical error, filed some 750 days

after original judgment entered, restart thirty-day time period where appeal did not relate to correction in amended judgment).

2. Nature of a special permit. "Special permit procedures have long been used to bring flexibility to the fairly rigid use classifications of Euclidean zoning schemes . . . by providing for specific uses which are deemed necessary or desirable but which are not allowed as of right because of their potential for incompatibility with the characteristics of the district." SCIT, Inc. v. Planning Bd. of Braintree, 19 Mass. App. Ct. 101, 109 (1984). "Uses most commonly subjected to special permit requirements are those regarded as troublesome (but often needed somewhere in the municipality, for example, gasoline service stations, parking lots, and automobile repair garages) . . . ; and uses often considered desirable but which would be incompatible in a particular district unless conditioned in a manner which makes them suitable to a given location (for example, an apartment house in a single family residential district)." Id.

In the case of the town, special permits are governed by art. VI, § 174-24(C)(2), of the bylaw, which provides in relevant part that "[a] Special Permit may be issued only following the procedures specified by the General Laws and may be approved only if it is determined that the proposed use or development is consistent with applicable [S]tate and town

regulations, statutes, bylaws and plans, will not adversely affect public health or safety, will not cause excessive demand on community facilities, will not significantly decrease surface or groundwater quality or air quality, [and] will not have a significant adverse impact on . . . neighboring properties."

3. <u>Standard of review</u>. A judge's review of the decision by a local zoning board of appeals under G. L. c. 40A, § 17, consists of both independent fact finding and deference to the judgment of local officials. As the Supreme Judicial Court has stated:

> "The trial judge makes his own findings of facts and need not give weight to those the board has found. The judge then determines the content and meaning of statutes and by-laws and . . . decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application. . . . We accord deference to a local board's reasonable interpretation of its own zoning bylaw, with the caveat that an incorrect interpretation of a statute . . . is not entitled to deference.
>
> "After determining the facts and clarifying the appropriate legal standards, the judge determines whether the board has applied those standards in an unreasonable, whimsical, capricious or arbitrary manner. . . . The board is entitled to deny a permit even if the facts found by the court would support its issuance. The judge nonetheless should overturn a board's decision when no rational view of the facts the court has found supports the board's conclusion." (Quotations and citations omitted.)

<u>Shirley Wayside Ltd. Partnership</u> v. <u>Board of Appeals of Shirley</u>, 461 Mass. 469, 474-475 (2012) (<u>Shirley Wayside</u>). See <u>MacGibbon</u> v. <u>Board of Appeals of Duxbury</u>, 356 Mass. 635, 639 (1970);

Bicknell Realty Co. v. Board of Appeal of Boston, 330 Mass. 676, 679 (1953); Davis v. Zoning Bd. of Appeal of Chatham, 52 Mass. App. Ct. 349, 356 (2001). "On appellate review, the judge's findings of fact will not be set aside unless they are clearly erroneous or there is no evidence to support them. We review the judge's determinations of law, including interpretations of zoning bylaws, de novo." (Quotations and citations omitted.) Shirley Wayside, supra at 475. If the board's decision is supported by the facts found by the judge, it "may be disturbed only if it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." Bateman v. Board of Appeals of Georgetown, 56 Mass. App. Ct. 236, 242 (2002), citing ACW Realty Mgt., Inc. v. Planning Bd. of Westfield, 40 Mass. App. Ct. 242, 246 (1996).

4. Allocation of the burden of proof. To ensure that judicial review proceeds in a manner that is consistent with G. L. c. 40A, § 17, it is essential that the judge correctly allocate the burden of proof. On appeal to the Superior Court from a decision granting a special permit, the burden of proof is upon the applicant seeking the special permit and the board granting the special permit to submit evidence to demonstrate that the statutory prerequisites for the granting of a special permit have been met, and that the special permit was properly issued. See Kirkwood v. Board of Appeals of Rockport, 17 Mass.

App. Ct. 423, 427 (1984). This burden encompasses the burden of production as well. "[T]he burden of going forward with evidence rests on the party seeking to establish the validity of a variance or a special permit" and "the ultimate burden of persuasion rest[s] upon the owner of the locus." Knott v. Zoning Bd. of Appeals of Natick, 12 Mass. App. Ct. 1002, 1004 (1981).

As noted above, § 174-24(C)(2) of the bylaw provides that a special permit may be issued "only . . . if it is determined that the proposed use or development is consistent with applicable [S]tate and town regulations, statutes, bylaws, and plans, will not adversely affect public health or safety, . . . [and] will not significantly decrease . . . air quality." It is significant that the town has chosen not to declare that the standards relating to "public health or safety" and "air quality" that an applicant must meet in order to qualify for issuance of a special permit are satisfied by compliance with State and Federal environmental laws and regulations.[12]

Under the bylaw, it was Auto Body's burden to prove that the special permit use will not significantly decrease the air quality or have a significant adverse impact on neighboring properties. See GPH Cohasset, LLC v. Trustees of Reservations,

_____

[12] The question whether the bylaw is preempted by State law was not raised below, and we express no opinion on the matter.

85 Mass. App. Ct. 555, 558 (2014) (applicant's duty to prove entitlement to special permit); Stivaletta v. Zoning Bd. of Appeals of Medfield, 12 Mass. App. Ct. 994, 994 (1981) (burden on party seeking special permit to prove, pursuant to local bylaw, that proposed use would not endanger health and safety of district's residents or other land within district).  See also Dowd v. Board of Appeals of Dover, 5 Mass. App. Ct. 148, 154-155 (1977).

There have been cases where an unfortunate turn of phrase suggested that the judge shifted the burden to the party opposing zoning relief but such error has been found harmless where a review of the entire record indicates that the judge considered all the evidence carefully and recognized that the ultimate burden of persuasion rested upon the owner of the locus.  See, e.g., Tebo v. Board of Appeals of Shrewsbury, 22 Mass. App. Ct. 618, 626 (1986); Knott, 12 Mass. App. Ct. at 1004.  This is not such a case.

Because the judge found as a fact that the operation of Auto Body's paint shop would result in the release into the atmosphere of harmful molecules that for up to five minutes following their release pose a danger to people who are exposed to them, Auto Body had the burden to produce evidence and to persuade the judge that those molecules, i.e., the monomers of isocyanates that will escape from Auto Body's filtration system

and reach the plaintiffs' property, "will not adversely affect public health or safety . . . [and] will not significantly decrease . . . air quality."  The judge did not make such a finding, and on the record before us, there is no evidence that would support such a finding.[13]  The judge's statement that "[w]ithout affirmative evidence of a significant decrease in air quality, [he found that] it [is] prudent to rely on the regulatory process governing auto repair shops (both EPA and DEP) to ensure [Auto Body's] shop will not significantly decrease air quality and thus will not adversely [affect] public health," effectively shifted the burden of proof to the plaintiffs to prove that there would be a significant decrease in air quality.[14]

---

[13] The only evidence offered by Auto Body with regard to air quality was that (i) it would use the best available filtering technology, (ii) it would comply with State and Federal regulations, (iii) the industry is working toward eliminating the use of isocyanates but had not yet achieved its goal, and (iv) its current operation in the village of Hyannis has had no complaints.

[14] The plaintiffs' expert's testimony that the amount of isocyanates that would be released during the periods that top coats are being applied would be 30,000 times in excess of the Massachusetts ambient air level guideline was unchallenged. Even if the judge properly rejected the plaintiffs' expert's opinion that the isocyanates would not be degraded and would present a health risk when they reach the plaintiffs' property, it was Auto Body's burden to prove that the isocyanates would not present a health risk, not the plaintiffs' burden to prove that they would.

We have a further concern about the lack of specificity in the judge's decision concerning the fact that Auto Body must comply with State and Federal regulations.  The judge found that there are no State or Federal regulations governing the required distance between a paint booth exhaust stack and residential properties.  The regulations relied on by the judge were not included in the record appendix and though he took judicial notice of several Massachusetts regulations, e.g., 310 Code Mass. Regs. § 7.03 (2011), 310 Code Mass. Regs. § 7.12 (2001), and 40 C.F.R. §§ 63.11169 et seq. (2014), there was little testimony as to which subsections, if any, are applicable to the proposed paint booth.[15]  The mere fact that there is a requirement that records be kept regarding the amount of paint product containing isocyanates that is used during a given time period is not sufficient to establish that the use of isocyanates "will not adversely affect public health or safety . . . [and] will not significantly decrease . . . air quality."

We recognize that at least in the realm of comprehensive permits issued pursuant to the Comprehensive Permit Act, G. L. c. 40B, §§ 20-23, we have suggested that it would be

---

[15] Auto Body pointed to requirements that the operator of a paint booth register its operations with and report to the DEP a description of the facility, equipment, hours of operation, schedule, raw materials, fuels used, and construction or alterations of the facility, and keep other records on site.

unreasonable to deny a plan that could be approved conditioned upon submission, for example, of a waste disposal system plan that would comply with State standards.  See, e.g., <u>Zoning Bd. of Appeals of Holliston</u> v. <u>Housing Appeals Comm</u>., 80 Mass. App. Ct. 406, 416-418 & n.9 (2011).  Even in c. 40B appeals, however, "[c]ompliance with State standards . . . is not necessarily the end of the inquiry."  <u>Reynolds</u> v. <u>Zoning Bd. of Appeals of Stow</u>, 88 Mass. App. Ct. 339, 348 (2015).  The local board may justify denying a comprehensive permit by identifying a health concern that, among other things, is not adequately addressed by compliance with State standards.  <u>Id</u>.  Here, given the judge's finding and acknowledgement of "the known [hazards] of isocyanates," there simply has been no showing that compliance with State and Federal standards is sufficient to ensure an absence of airborne health risks to the plaintiffs. Accordingly, where Auto Body presented no evidence as to the effects on neighboring properties, it is unclear which subsections of 310 Code. Mass. Regs. § 7.03 (2001) and 40 C.F.R. §§ 63.11169 et seq. (2014) Auto Body and the judge even relied on, and it has not been shown that compliance with the regulations is sufficient to ensure that the emissions from the paint booth will not adversely affect public health or safety, we conclude that the board's determination, as well as the judge's determination, that Auto Body met the requirements for

issuance of a special permit under the bylaw is not supported by the evidence and is based on a legally untenable ground.

To the extent Auto Body argues that the condition that the paint booth vent at the farthest point from the plaintiffs' property satisfies their concerns, the health agent of the town's board of health admitted at trial that the decision to relocate the venting was based only on his surmise that it would help dissipate exhaust from the paint booth, and was not based on expert opinion or guidance from a "standard."  The minutes of a board of health meeting indicate that Auto Body discussed either installing an exhaust fan with tubing to discharge the spray to the other side of the building away from the plaintiffs' property, or scheduling air quality samples to be taken to test the exhaust for volatile organic compounds.  No further details of the discussion are in the minutes.  The board of health voted to recommend venting the paint booth from the northern side of the building, away from residential properties. There is no evidence that positioning the vent farther away from the residences eliminates the plaintiffs' health concerns.  No air quality samples are planned even though had the paint booth vented vertically, the board "was interested in actually seeing . . . the concentration in the exhaust."  Indeed, the health agent testified that the board of health was informed that all of the paints were water based and that this fact was important

to its members.  The judge commented that the health agent's testimony gave him pause but that he (the judge) was persuaded that the board "was correctly informed that only the majority of paint products will be water based."[16]

Finally, the judge suggested that the result he reached was supported at least in part by the fact that the industrial area was created before the plaintiffs' neighborhood, and the plaintiffs were aware they purchased homes adjacent to "an active, growing industrial area."  Even putting aside the plaintiffs' assertion that nothing in the record suggested the locus was in an active, growing industrial area when they purchased their homes, the judge cites to no authority and nothing in the bylaw that suggests that the plaintiffs' assertions of significant adverse impact due to the discharge of isocyanates must be viewed through the lens of purchasing property adjacent to an industrial area.  If for no other reason, the concept of "coming to a nuisance" is inapplicable because the plaintiffs are not pursuing a nuisance claim. Amaral v. Cuppels, 64 Mass. App. Ct. 85, 90 (2005).  And while,

---

[16] Our review of the record reveals that although the board decision does indicate that the majority of the paint would be water based, there was no discussion of what chemicals might be in the nonwater-based paint or at what concentration harmful products might be released with the paint booth exhaust. Nothing in the submissions to the board or in the board's decision reflects that the rest of the paint would contain isocyanates or other harmful chemicals.

perhaps, a purchaser of property adjacent to an industrial area might be expected to anticipate a certain amount of noise or even nontoxic odors, the judge cites to nothing that suggests that any neighbor, whether in an industrial or a residential area, must tolerate a certain amount of exposure to toxic chemicals released into the air.

Conclusion.  For the above reasons, we vacate the judgment of the Superior Court and order a new judgment to enter annulling the decision of the board to allow Auto Body's special permit application.

So ordered.