NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-170

GUY MADDALONE & another[1]

vs.

BOARD OF APPEALS OF NANTUCKET & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiffs, Guy and Diane Maddalone, appeal from a judgment issued by a Land Court judge affirming the decision of the board of appeals of Nantucket (board) to grant the defendant, Michael Metz, a special permit to renovate and enlarge the existing structures on his property.[3]  We affirm.

Background.  The plaintiffs own a two-story vacation home with ocean views located in the Surfside area of Nantucket at 14 Western Avenue (Maddalone property).  The abutting property to

---

[1] Diane Maddalone.

[2] Michael Metz.

[3] The board did not file a brief or appear at oral argument.

the west is 16 Western Avenue, which has been owned by Metz since 2007.

When the Maddalones purchased their property in January 2017, the Metz property housed a ramshackle dwelling and a weathered garage (existing structures).  The existing structures predated the 1972 adoption of the town of Nantucket's zoning bylaw (bylaw).  The part of the Metz property pertinent to this case is located in an R-20 district pursuant to the bylaw, in which allowed uses include "primary dwellings."[4]  "Garages-residential" use is allowed therein when it qualifies as "accessory use."[5]

Under the bylaw's setback provisions in § 139-16.A, structures in the district must be positioned at least ten feet from side yard boundary lines and thirty feet from front yard

---

[4] The bylaw defines "primary dwelling" in § 139-2 as "[a] detached single-family dwelling unit or the portion of a structure that contains a single dwelling unit.  A primary dwelling may contain an attached garage."  The bylaw defines "dwelling unit" in § 139-2 as "[a] room or enclosed floor space used, or to be used, as a habitable unit for one family or household, with facilities for sleeping, cooking and sanitation."

[5] The bylaw defines "accessory use" in § 139-15 as an "activit[y] as [is] subordinate and customarily incident to . . . permitted uses."

2

property or street lines.  The existing structures were both in violation of these requirements.[6]

1.  Use of the Metz property prior to December 2020.  For a total of thirteen seasons during the 1980s up to 1998, a previous owner of the Metz property rented the property to a family.  The use of the Metz property between 1998 and November 2007 is unknown, but the parties agreed that the existing structures had been in a state of disrepair for a number of years before Metz's purchase.  This disrepair rendered the Metz property uninhabitable, and no one was living there when Metz purchased the property.  Between 2007 and December 2020, Metz did not lease the property to anyone, and no one resided there.

Metz and his family used the garage between 2007 and December 2020 for storage of motor vehicles and bicycles. Metz's caretakers performed some repairs of the garage during that time.  Metz's caretakers performed seasonal cleanups and light maintenance of the exterior of the Metz property every year from late 2007 through December 2020.  During that period, Metz or his caretakers inspected the premises monthly for signs of break-ins or damage.

---

[6] The existing dwelling was 15.6 feet from the Metz property's front line (along the southern edge of Western Avenue) and 5.6 feet from the property's western boundary.  The existing garage was only 0.2 feet from the Metz property's front line and 7.8 feet from the boundary with the Maddalone property.

3

Between 2009 and 2010, Metz enlarged the septic system to accommodate a five-bedroom dwelling, though the existing dwelling had fewer bedrooms than that.

In 2015, Metz was approached by a real estate broker who proposed to market the Metz and Maddalone properties together. Metz agreed, and had the boards and other protective coverings removed from the existing dwelling's windows and doors. Metz and the broker hired a landscaping crew to remove poison ivy and brush that blocked the existing dwelling's ocean views, and the broker "staged" the dwelling's interior and took promotional photographs and video recordings. In the second half of 2015, the broker showed the interior of the existing dwelling to several buyers. During each summer between 2016 and 2019, the broker showed the property to two or three prospective buyers.

2. Proposed renovations. On December 15, 2020, Metz applied to the board seeking a special permit under § 139-33.A of the bylaw for the proposed improvements to the property. The proposal was to remove the existing garage and construct a two-story, full basement addition on the eastern side of the existing dwelling, as well as raising the existing roofline and expanding the dormered second floor of the existing dwelling. The proposal also called for the installation of two new window

4

wells, one in each proposed basement bedroom, to satisfy the bylaw's basement egress requirements.

Whereas the closest distance between the Maddalone property line and the existing structures was 7.8 feet, the retaining walls attached to the proposed window wells would come closer to the Maddalone property boundary than 7.8 feet. The renovation would in fact increase the distance between any structure and the Metz property front line from 0.2 feet to 10.4 feet.

After removing the existing garage, a new expanded second story of the dwelling would occupy the space above where the garage had been, coming up to 7.8 feet from the Maddalone property line.

3. Proceedings below. The Maddalones wrote a letter to the board opposing Metz's application for a special permit. The board issued its decision granting the permit in March 2021, and the plaintiffs appealed from that decision to the Land Court pursuant to G. L. c. 40A, § 17. In June 2023, the town building commissioner issued a building permit to Metz for the renovations and construction was completed by the time of trial.

The parties appeared for trial on four issues:[7] (1) whether Metz abandoned the right to obtain a special permit through

---

[7] The judge added the issue of standing, which he resolved in favor of the Maddalones.

5

"non-use" of the existing dwelling; (2) whether the window wells were excluded from the special permitting exemptions in the bylaw; (3) whether Metz's renovations would not be substantially more detrimental to the neighborhood than the preexisting nonconforming structures; and (4) whether the renovations were in conformity with the general purpose and intent of the bylaw.

In a first decision (Maddalone I), the judge vacated the board's decision and remanded to the board to determine whether, for three or more years after November 2, 2016,[8] the existing dwelling on the Metz property had been in a condition in which it could not be used as a "dwelling unit" pursuant to the bylaw, such that the dwelling had lost the bylaw's protections for existing nonconforming uses and structures and therefore could not be reestablished by special permit, instead requiring a variance.

On May 24, 2023, following a public meeting, the board issued a second, unanimous decision (remand decision) to grant Metz a special permit for the proposed renovation. In its remand decision, the board interpreted the bylaw's "non-use" provision to mean that a preexisting, nonconforming single-family dwelling retains its protected status for "[s]o long as

_____

[8] The significance of this date is discussed infra.

6

. . . [it] remains in physical existence and through a combination of permitting and/or rehabilitation may be inhabited."  The Maddalones appealed from the board's remand decision, pursuant to G. L. c. 40A, § 17.

On January 30, 2024, the judge issued an order (Maddalone II) ruling that the board's interpretation of the bylaw was unreasonable and articulating the test for "non-use" of an unoccupied, preexisting, nonconforming dwelling under the bylaw as "whether 'there was . . . no effort to market, rent, or occupy the dwelling or to maintain it as a dwelling'" (citation omitted).  The judge continued the case to allow the parties the opportunity to supplement the trial record pertaining to the determination of "non-use."  On June 13, 2024, the judge issued an order resolving the "non-use" issue in favor of Metz and the board, without making further findings or legal conclusions.

On November 8, 2024, the judge resolved the remaining issues in favor of the defendants and entered judgment affirming the board's remand decision.  This appeal followed.

Discussion.  1.  Standard of review.  In reviewing the decision of a municipal board under G. L. c. 40A, the Land Court "shall hear all evidence pertinent to the authority of the board or special permit granting authority and determine the facts, and, upon the facts as so determined, annul such decision . . .

7

or make such other decree as justice and equity may require." G. L. c. 40A, § 17.  On appeal from a board's "decision granting a special permit, the burden of proof is upon the applicant . . . and the board . . . to submit evidence to demonstrate that the statutory prerequisites for the granting of a special permit have been met, and that the special permit was properly issued." Fish v. Accidental Auto Body, Inc., 95 Mass. App. Ct. 355, 362 (2019).  "On appellate review, we defer to the factual findings of the trial judge unless they are clearly erroneous.  We review the judge's determinations of law, including interpretations of zoning bylaws, de novo, but we remain 'highly deferential' to a board's interpretation of its own ordinances" (citations omitted).  Grady v. Zoning Bd. of Appeals of Peabody, 465 Mass. 725, 728-729 (2013).

2.  <u>Creation of new nonconformities</u>.  The plaintiffs argue that the judge erred in concluding that no new nonconformity was created by the renovations.  They contend that the new dwelling's second story and window wells are new nonconformities that require a variance rather than a special permit.

a.  <u>Second story of new dwelling</u>.  Because only the existing garage, and not the existing dwelling, violated the eastern side yard setback, the plaintiffs contend that the intrusion of the new dwelling into that setback is a new

8

nonconformity that does not enjoy the protections of the garage's preexisting nonconformity.  We do not reach the merits of this argument because it is not properly before us.

At a pretrial conference, the judge and the parties identified four issues for trial.  Whether the new second story's encroachment into the eastern setback created a new nonconformity was not among those issues.  Our review of the record shows that the first and only time that the plaintiffs raised this issue at trial was in their closing argument.  However, the defendants responded by requesting the judge to disregard the argument on the ground that it "was rejected by the [c]ourt in the summary judgment phase and is outside the scope of the express issues identified for trial."  The record provided to us by the plaintiffs nowhere else references the issue,[9] and does not include the pretrial briefing or any information about the summary judgment phase.  As far as we can tell, neither the board's two decisions nor the judge's three written decisions addressed the new nonconformity of the second story now raised by the Maddalones.  The Maddalones concede as much in their brief.

---

[9] The issue was also not raised in the plaintiffs' complaints, filed in April 2021 and as amended in June 2023 following the board's remand decision, which stated that "the [i]mprovements increased the existing side-yard setback non-conformity" (emphasis added).

The record is thus inadequate to evaluate whether the issue was properly raised below, why it was excluded from trial, and how it was treated by the judge. The plaintiffs, as appellants, bore the burden of producing a record appendix adequate for an appellate court to review. Mass. R. A. P. 18 (a), as appearing in 481 Mass. 1637 (2019); Openshaw v. Openshaw, 493 Mass. 599, 611 n.21 (2024). Therefore, the issue is not properly before us.

b. Window wells. The plaintiffs argue that the board's interpretation of the bylaw as excluding at or below-grade window wells from the definition of "structure" was unreasonable, and that the judge erred by deferring to that interpretation. Because Metz's new window wells extended farther into the east side yard setback than any existing structure, the plaintiffs contend that they created a new nonconformity. We disagree.

The term "Structure" is defined under § 139-2 of the bylaw as follows:

> "Anything constructed or erected, the use of which requires a fixed location on the ground. 'Structure' shall be construed, where the context allows, as though followed by the words 'or part thereof' and shall include, but not be limited to, buildings [and] retaining walls which support buildings . . . . 'Structure' shall not include retaining walls not exceeding four feet in height for landscaping purposes. . . ."

10

The term "window well" appears twice in § 139-2, in the definitions of "ground cover" and "secondary dwelling," but is never separately defined.  As the judge observed, a primary function of the window wells is to "prevent . . . side lawns from subsiding into excavated areas surrounding [the] home's basement windows."  It is patently reasonable to consider the structural aspect of window wells as akin to a "landscape retaining wall."  Because window wells do not support the buildings to which they are attached, this similarity does not warrant their treatment as "structures" under the definition's second sentence.  However, because the bylaw's calculation of a structure's height pursuant to § 139.17.A disregards the subterranean portion thereof, below-ground window wells such as Metz's are functionally similar to the "retaining walls not exceeding four feet in height for landscaping purposes" that are excluded by the definition's third sentence.  In light of this analogy, and because the list of excluded structures in the third sentence is not expressly exhaustive, the board's interpretation of "structure" as excluding window wells is reasonable and entitled to deference.  Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 475 (2012).  The judge did not err.

11

We also find unavailing the plaintiffs' argument that the board's interpretation of the bylaw conflicts with the Massachusetts Building Code.  Where G. L. c. 40A does not define a term -- here, "structure" -- it is understood that the Legislature intended to leave it "to each municipality to define the term . . . for purposes of its own zoning code," consistent with the general delegation of zoning authority.  BAK Realty, LLC v. Fitchburg, 495 Mass. 587, 595 (2025).  The town of Nantucket is free to define "structure" for purposes of its own zoning bylaw, notwithstanding the Building Code's treatment of window wells.

3.  Nonuse of the existing dwelling.  General Laws c. 40A, § 6, permits municipalities to end statutory protections for preexisting, nonconforming structures and uses if such nonconformities have not been "used for a period of two years or more."  See Chiaraluce v. Zoning Bd. of Appeals of Wareham, 89 Mass. App. Ct. 290, 293-294 (2016).  Nantucket's corresponding "non-use" provision, found in § 139-33.C of the bylaw, provides that "[n]onconforming uses and structures abandoned or not used for a period of three years shall not be reestablished."

a.  Applicable time period.  The plaintiffs argue that the judge erred by limiting review of the use of the existing dwelling to after November 2, 2016.  We disagree.

12

November 2, 2016, is the effective date of St. 2016, c. 184, § 1, entitled "an act relative to non-conforming structures," which inserted the following new third paragraph into G. L. c. 40A, § 7:

> "If real property has been improved by the erection or alteration of 1 or more structures and the structures or alterations have been in existence for a period of at least 10 years and no notice of an action, suit or proceeding as to an alleged violation of this chapter or of an ordinance or by-law adopted under this chapter has been recorded in the registry of deeds for the county or district in which the real estate is located or, in the case of registered land, has been filed in the registry district in which the land is located within a period of 10 years from the date the structures were erected, then the structures shall be deemed, for zoning purposes, to be legally non-conforming structures subject to section 6 and any local ordinance or by-law relating to non-conforming structures."

The new act also expressly provided that the amendment would apply retroactively to structures "erected prior to" the statute's effective date. St. 2016, c. 184, § 2.

In this case, the judge found that the existing structures predated the 1972 adoption of the Nantucket bylaw and that the Metz property was never the subject of a notice of the type described in the amendment. Thus, the plain language of the amendment "deemed [the existing structures], for zoning purposes, to be legally non-conforming structures subject to section 6 and [the bylaw]." G. L. c. 40A, § 7. As the judge correctly stated, "even if the [e]xisting [s]tructures lost their protected status on account of non-use prior to November

13

2, 2016, the 2016 amendment to § 7 restored that status as of that date."  The judge did not err in limiting review of nonuse to after the enactment of the amendment.

The plaintiffs argue to the contrary that the statute did not create new protected structures because it merely "affirm[s] that the nonconforming structures are subject to further regulation and use analysis."  This reading is untenable because it would render the statute practically meaningless.  Volin v. Board of Pub. Accountancy, 422 Mass. 175, 179 (1996).  Moreover, it is irreconcilable with the statute's key language, providing that qualifying "structures shall be deemed . . . to be legally non-conforming structures."  G. L. c. 40A, § 7.

b.  Finding of nonoccurence of "non-use".  The plaintiffs argue that "there were at least two three-year periods of non-use such that the preexisting nonconforming status of the [e]xisting [d]welling was lost . . . prior to the 2021 special permit [d]ecision."

One period of "non-use" alleged by the plaintiffs' brief is from 2010, the time of the septic system upgrade, to late 2015, when Metz began working with a broker.  In light of our prior determination that review of nonuse is properly limited to after November 2, 2016, we need not consider this period.

14

The second alleged period of "non-use" is not specifically identified in the plaintiffs' brief.  Instead, the brief vaguely asserts that Metz "took zero steps for over 13 years to improve the dwelling such that it could function as a residence" and that there was "clear evidence of vacancy, uninhabitability, lack of utilities and appliances, and no efforts to maintain the [e]xisting [d]welling as a residence."

The plaintiffs do not appear to dispute the legal test for "non-use" under the bylaw, and as applied by the judge -- whether "there was . . . no effort to market, rent, or occupy the dwelling or to maintain it as a dwelling."  Rather, the plaintiffs contend that the judge "flipped the analysis" by "putting excessive weight" on the factors of effort to market or rent the dwelling.  We disagree.

Because the bylaw's definition of a "dwelling unit" contemplates not just actively inhabited units but also any "room or enclosed floor space . . . to be used . . . as a habitable unit," evidence of an effort to market or rent a dwelling for future use as a habitable unit may suffice, standing alone, to establish use as a "primary dwelling." Whether Metz met his burden to do so was a question of fact for the trial judge.  See, e.g., Orange v. Shay, 68 Mass. App. Ct. 358, 362 (2007).

15

A judge should not set aside a board's decision unless the decision was "based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970). The court must determine that "no rational view of the facts the court has found supports the board's conclusion" in order to overturn the decision of the board. Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68, 74-75 (2003).

Here, the judge found that the existing dwelling had its interior "staged" for showings in late 2015 and was shown a few times each summer between 2017 and 2019. From 2016 to 2020, Metz's caretakers continued to perform seasonal cleanups and light maintenance on the existing structure's exterior. A "rational view of the facts" could support the conclusion that there was use of the dwelling between 2017 and 2020 based on an effort to market the property. Britton, 59 Mass. App. Ct. at 75. Therefore, the judge did not err in finding that there was no three-year period of "non-use" in the relevant time between November 2, 2016, and December 2020.

4. Substantial detriment to the neighborhood. The plaintiffs argue that the judge erred in concluding that the new dwelling is not more substantially detrimental to the neighborhood than the existing dwelling because it increases the

16

density of the neighborhood, significantly alters the mass and appearance of the structure, and intrudes farther into the side yard setback than the prior dwelling. We are not persuaded.

The judge found that the renovated Metz structures were approved by the Nantucket historic district commission, "fit the Surfside neighborhood architecturally and are less massive than many of the nearby homes, including the Maddalones'." Nine out of twelve houses on Western Avenue had second stories, and some other houses in the Surfside neighborhood feature attached garages and renovated basements with window well egresses like the Metz property.

Regarding the side yard setback, the evidence supports the judge's finding that the renovated dwelling added forty-four square feet of encroaching second-floor space on the building's eastern side yard (abutting the Maddalone property) but removed at least 160 square feet of the existing garage's ground-level encroachment into the Metz property's front yard setback.

The judge did not err in determining that the board's finding was rational considering that the renovation conformed to the neighborhood's architecture and substantially reduced the Metz property's total setback nonconformity. See Britton, 59 Mass. App. Ct. at 74 (judge's review of "substantially more

17

detrimental" finding is limited to whether "any rational board could [reach that] conclu[sion]" based on facts found by judge).

5. Factual challenges. The plaintiffs challenge several of the judge's factual findings concerning the window wells, the eastern setback, and the use of the existing dwelling.

The plaintiffs incorrectly characterize as a finding the judge's determination that the window wells are not part of the "structure" of the new dwelling. Other than the factual questions of the height of the window wells and whether they supported the dwelling, which the plaintiffs do not challenge on appeal, this was a purely legal question concerning the interpretation of the bylaw's definition of "structure." Our review of the two specific findings challenged by the plaintiffs -- finding seventeen of Maddalone I[10] and finding twenty-six of the instant case[11] -- likewise reveals that the nature of the plaintiffs' objections is legal, not factual.

_____

[10] Finding seventeen stated that "[a]s part of the Renovations, Mr. Metz raised the roofline of the Existing Dwelling and, taking advantage of the area the Existing Garage occupied, expanded the second floor of the Dwelling easterly, towards 14 Western Ave."

[11] Finding twenty-six stated that "[t]he Renovations also didn't change the Existing Garage's non-conforming eastern side-yard setback distance (7.8 feet), but they extended into the Garage's non-conforming setback, within the Garage's footprint, a second floor."

18

Finally, the plaintiffs challenge the judge's findings "[t]o the extent the [judge] found that the [e]xisting [d]welling did not lack 'facilities for sleeping, cooking, and sanitation.'"  In fact, the judge only found that there was a lack of evidence about the absence of those facilities during the period in which the existing dwelling was being "staged" and shown to prospective buyers.  Based on our review of the record, we conclude that this finding was not clearly erroneous.

<u>Judgment affirmed</u>.

By the Court (Walsh, Toone & Tan, JJ.[12]),

*Paul Little*

Clerk

Entered:  March 9, 2026.

---

[12] The panelists are listed in order of seniority.